[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15985

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 1, 2011
JOHN LEY
CLERK

D. C. Docket No. 06-20373-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BURSON AUGUSTIN,
a.k.a. B,
STANLEY GRANT PHANOR,
a.k.a. Brother Sunni,
PATRICK ABRAHAM,
a.k.a. Brother Pat,
ROTSCHILD AUGUSTINE,
a.k.a. Brother Rot,
NARSEAL BATISTE,
a.k.a. Brother Naz,
a.k.a. Prince, Manna,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 1, 2011)

Before TJOFLAT and MARTIN, Circuit Judges, and DAWSON,* District Judge.

PER CURIAM:

Burson Augustin, Stanley Grant Phanor, Patrick Abraham, Rotschild Augustine, and Narseal Batiste (collectively, "Appellants") were all convicted of (1) conspiracy to provide material support to a Foreign Terrorist Organization (Al Qaeda) by agreeing to provide personnel (including themselves) to work under Al Qaeda's direction and control, knowing that Al Qaeda has engaged or engages in terrorist activity, in violation of 18 U.S.C. § 2339B; and (2) conspiracy to provide material support by agreeing to provide personnel (including themselves), knowing and intending that they were to be used in preparation for and in carrying out a violation of 18 U.S.C. §§ 844(f)(1) and (i), and to conceal and disguise the nature, location, source, and ownership of such material support, all in violation of 18 U.S.C. § 2339A. Abraham and Batiste were also convicted of conspiracy to

_____

* Honorable Robert T. Dawson, Senior United States District Judge for the Western District of Arkansas, sitting by designation.

2

maliciously damage and destroy by means of an explosive a building leased to an agency of the United States (the FBI) and a building used in interstate and foreign commerce (the Sears Tower), all in violation of 18 U.S.C. § 844(n).[1]  Additionally, Batiste was convicted of conspiracy to levy war against the Government of the United States and to oppose by force the authority thereof in violation of 18 U.S.C. § 2384.

Appellants now appeal their convictions, raising six issues.  First, Batiste and Augustine challenge the district court's order granting in part the government's motion to strike portions of the indictment as surplusage.  Second, Augustin, Phanor, and Augustine each challenge the sufficiency of the evidence supporting their convictions.  Third, Augustin argues that the government's involvement in the criminal scheme was outrageous and therefore violated the Due Process Clause of the Fifth Amendment.  Fourth, Batiste and Abraham challenge several of the district court's evidentiary rulings relating to the admissibility of lay and expert testimony.  Fifth, Batiste argues that limitations on his cross-examination of witnesses resulted in cumulative error requiring a new trial.  Sixth,

---

[1] The district court's judgment with respect to Batiste incorrectly states that Count 3 charged a violation of 18 U.S.C. § 844(l).  Because "[i]t is fundamental error for a court to enter a judgment of conviction against a defendant who has not been . . . found guilty of the crime recited in the judgment," we may *sua sponte* raise the issue that there is a clerical error in the judgment and remand with instructions that the error be corrected.  United States v. Massey, 443 F.3d 814, 822 (11th Cir. 2006).

all of the appellants challenge the district court's dismissal of a juror for refusing to follow the court's instructions on the law. After careful review of the record and the parties' briefs, and after having had the benefit of oral argument, we affirm.

I.

We first recite the facts of this case in the light most favorable to the government. United States v. Glen-Archila, 677 F.2d 809, 812 (11th Cir. 1982). We then describe the procedural history.

A.

Batiste was the leader of the Miami branch of an organization called the Moorish Science Temple, headed in Chicago by an individual known as Sultan Khan-Bey, who named Batiste a minister in the Temple in July 2004. His followers included the other appellants—Abraham, Phanor, Augustin, and Augustine—as well as Batiste's wife, Minerva Vazquez, and two other men charged (but subsequently aquitted) in this case, Naudimar Herrera and Lyglenson Lemorin.

As early as 2004, Batiste's group mixed political and religious ideology with martial arts training. The group frequented a convenience store called Al-Saidi Enterprises, where Batiste engaged in political and religious conversations

4

with Abbas Al-Saidi ("Abbas"), a part owner of the store. The government offered evidence that in these conversations, Batiste mentioned his agreement with Osama Bin Laden's plans to kill Americans in retaliation for America's killing of Muslims around world. The government contends that when Batiste learned that Abbas would be traveling home to Yemen, he asked him to help contact a foreign terrorist organization, such as Al Qaeda, Hammas, or Hezbollah, to help support Batiste's religious and political goals in the United States. According to Abbas, Batiste gave him a flyer containing Batiste's address and contact numbers to give to Abbas's connections with those organizations.

In the fall of 2005, Abbas contacted the FBI, and began working as a confidential informant for the agency. At the FBI's request, Abbas began to record his meetings with Batiste and the members of his group to determine if they were a threat. He also pretended that he had made contact with a terrorist organization that was willing to support Batiste's group. Batiste, Abraham, Herrera, and Augustin drove Abbas past the Miami FBI Building, and Batiste pointed to a window broken during Hurricane Wilma and noted how easy it would be to throw a grenade into the building. He observed that "the best time to attack the U.S. Government is during a disaster." On November 7, 2005, Augustin met with Abbas at the group's headquarters—known as the "Embassy"—and discussed

5

how the group's "plan" for "jihad" to "destroy" the "devil" would attract followers, who would see that "we're not just talking about taking over Miami or some Dade county, we're talking about taking over . . . Allah's world" through coordinated attacks in various locations.

At the direction of the FBI, Abbas told the group that a representative of a Middle East terrorist group was coming to meet them. In anticipation of the meeting, Batiste asked Abbas if the representative knew Osama Bin Laden, because Batiste would "want to meet Usama Bin Laden."[2] Batiste described his plan to train "soldiers" in order to "make war against America." He explained: "I got a mission . . . this is the time for Jihad."

On December 16, 2005, Abbas introduced Batiste to a second FBI informant, Ellie Assaad ("Assaad"), who was posing as Abbas's foreign terrorist connection. To prove to Assaad that he was serious about his mission, Batiste told Assaad that he was in the "same situation" as an individual named Jeff Fort, who Batiste described as the "leader of one of the biggest gangs" based on "Islamic philosophy," and who went to jail in the 1980s "for terrorism," because "he was being helped by Libya."

---

[2] Variations in the spelling of names in this opinion reflect the fact that the names are spelled differently in various portions of the record.

Assaad asked Batiste to make a list of what support he wanted, and Batiste provided a list requesting uniforms, boots, machine guns, radios, and other equipment. On December 18, 2005, Abraham brought Abbas to the Embassy, where Batiste, Augustin, Phanor, and Herrera were meeting with a potential recruit. Batiste gave Abbas another list, including assault rifles, boots, uniforms, SUVs, binoculars, bulletproof vests, revolvers, phones, military jackets, and rocket launchers.

On December 21, 2005, Batiste told Abbas of his desire to create confusion through bombing or mass poisoning, and in particular raised the idea of blowing up or burning down the Empire State Building or the Sears Tower, adding "[t]hen you gotta get . . . the buildings right here in Miami." On December 22, 2005, Batiste gave Assaad another similar list of materials, this time specifying the shoe sizes for the members of his group. Batiste elaborated on the idea of attacking the Sears Tower. Batiste stated, "I know this building, I know how to get inside this building," and explained that he had been thinking about it since 1998. Federal Express records indicate that Batiste had worked for the company in the Chicago Loop (where the Sears Tower is located) in 1998. At a December 29, 2005 meeting, Assaad provided the boots Batiste had requested, and Batiste again elaborated on his idea for a dynamite attack on the Sears Tower, this time pointing

7

to his construction experience (as Batiste was, at the time, running a construction company in Miami): "If I can put up a building, I can take one down." Batiste provided another list, specifying various firearms and materials, as well as $50,000 in cash.

Batiste and Abraham became concerned that Assaad was involved with law enforcement, so when Abbas and Assaad arrived at the Embassy on January 28, 2006, Abraham, Herrera, and Augustin had them strip, change into other clothes, and hand over all electronic devices. Assaad hid the recording device, but refused to give up his phone, explaining that he needed to stay in touch with Al Qaeda at all times. Abraham drove Abbas and Assaad to see Batiste in Islamorada, without telling Abbas or Assaad where they were going during the two-hour drive. Once in the Keys, Abraham met up with Phanor, who had driven separately, and Phanor and Abraham insisted that Assaad surrender his phone, because according to Phanor: "in this business brother, with electronics, you can never be too safe . . . in this country, brother, . . . electronic devices [are] something terrible to have cause they find all kinda ways to, you know." But Phanor assured Assaad that when they spoke of him and his mission "in the circle," they "speak of you with great, great respect."

Abbas and Assaad were taken to meet Batiste in a fishing tent by the water.

8

Batiste explained that he was suspicious because the government was "concerned about domestic terrorism . . . citizens who will help out on the terrorist attack right here in America, as opposed to outsiders coming over here and doing it." Batiste explained that he was concerned that Assaad was taping their conversations. Assaad assured Batiste that "Al Qaida [was] very happy with your plans," and Batiste stated that "those plans will never change." Batiste and Assaad discussed obtaining funding and a new training headquarters in Miami, as well as bringing in a bomb expert from overseas. Batiste said that he could obtain the materials and access through his construction company, but he needed an expert to help making the bombs.

On February 19, 2006, Assaad, Batiste, and Abraham discussed details for sending members of Batiste's group overseas for Al Qaeda training. Batiste again elaborated on his plan to detonate explosives under the Sears Tower, explaining how he would obtain a city contract in order to gain access. Batiste also discussed the need for a new training space in Miami, and a video camera to "film [his] evidence." The next day, however, Batiste told Assaad that after talking to some of his group members, he decided that he wanted to train his members at his property in Louisiana rather than at an Al Qaeda camp.

On March 9, 2006, Assaad aborted a scheduled meeting with Batiste when

two of Batiste's men tried to strip search him at the Embassy. Eventually, Assaad returned and was searched by Abraham and Phanor before meeting with Batiste, Augustin, Augustine, and Herrera. Batiste expressed that he was pleased that Al Qaeda knew of his Sears Tower plan and wanted an alliance with him, but that he was anxious to receive the money he had requested from Assaad.

The next day, March 10, 2006, Batiste reaffirmed to Assaad his desire to form an alliance with Al Qaeda and took an oath of allegiance to Al Qaeda that the FBI had written for Assaad. Assaad requested that Batiste have all the group members come to the Embassy so he could "read . . . the commitment in front of everybody." Assaad, Batiste, and Phanor looked at a potential warehouse space, which Assaad presented to the group on March 16, 2006, the day the other defendants were offered the Al Qaeda oath. On the way to the meeting, Batiste told Phanor not to bring another member, "Brother Corey," because the meeting was "only for the closed circle." Batiste directed Lemorin and Phanor to conduct counter-surveillance to make sure "the coast [was] clear."

Batiste, Abraham, Augustin, Augustine, Phanor, Herrera, and Lemorin were at that March 16, 2006 meeting, with Augustine guarding the door. Batiste began by acknowledging how "grateful" his group was for the support of Bin Laden and Al Qaeda, and Batiste and Assaad both affirmed the bonds of the alliance. Each of

10

the defendants then took an oath, with Assaad first (at Batiste's prompting), reading it for them, and then the group members repeating along the second time through and substituting their own names in the relevant places. Augustine appears to have misstated the oath such that, on its face, he pledged allegiance to himself. Before taking the oath, Phanor asked Batiste whether it was "alright" to take the oath. With Batiste's approval, Phanor took the oath. After Batiste read from the Qur'an and from his ministerial license from the Moorish Holy Temple of Science, Assaad announced that the alliance between Al Qaeda and the Moors was now official, but stated "we are not controlling the Moors . . . [y]ou have your leader here." The defendants applauded.

After the oath, as directed by the FBI, Assaad asked Batiste if it was okay to discuss in front of the other members an Al Qaeda plan to blow up five FBI offices across the country, including the Miami office. Batiste said it was okay to discuss the plan in front of those present at the meeting (including all of the appellants), because they were "[his] close guards." Assaad explained the plan and asked for help videotaping the Miami FBI building, and presented Batiste with the video camera he had previously requested for his Sears Tower plan. Batiste accepted the task, and promised to deliver the tapes in about a week, but warned Assaad that "when I give you these tapes, you're gonna have to be very careful with those

11

tapes." Batiste continued to discuss his Sears Tower plan, and complained that it was taking too long for Assaad to come through with the financial support he had requested.

On March 24, 2006, on the way to purchase additional film equipment, Batiste and Abraham drove Assaad past the North Miami Beach FBI office and other alternative targets of their own choosing, such as the National Guard Armory in Northwest Dade and a synagogue. The next day, Phanor, Batiste, and Augustine drove a van around the federal courthouse complex and Federal Detention Center in downtown Miami, and then parked the van and took pictures and video footage of the building.[3] The following day, Batiste and Augustin gave Assaad photographs of the North Miami Beach FBI building and photographs and video recordings of the downtown courthouse complex, depicting the various views of the buildings at the two sites, including their security barricades, check-points, gas lines, and water supplies. In Augustin's presence, Batiste on two occasions offered advice to Assaad about the security observed at the Miami federal buildings and how to go about the attack.

Batiste obtained money from Assaad to bring Khan-Bey—the leader of the group in Chicago—to Miami, in order to tell Khan-Bey of the plan. Batiste also

---

[3] Batiste believed the downtown courthouse complex was a second FBI building.

12

brought his religious mentor, "Master Athea," to Miami, but Master Athea became disillusioned with Batiste's and Khan-Bey's beliefs. On April 19, 2006, Khan-Bey was arrested for firing a gun at Master Athea. Batiste became increasingly suspicious that Assaad was working with the FBI and began to decrease his communication with Assaad. On April 27, 2006, Master Athea spoke with the FBI and agreed to record a conversation with Batiste, in which they discussed their disagreements about Batiste's waging of a physical rather than spiritual war. Abraham was arrested on May 9, 2006 for overstaying his tourist visa. Abraham gave a statement, after receiving warnings in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), which was used only against him at trial. In that statement, he implicated himself and the other group members. The remaining defendants were arrested on June 22, 2006.

## B.

On June 22, 2006, Augustin, Phanor, Abraham, Augustine, Batiste, Herrera and Lemorin were indicted by a federal grand jury sitting in the Southern District of Florida. They were charged with four counts: (1) conspiracy to provide material support to a Foreign Terrorist Organization (Al Qaeda) by agreeing to provide personnel (including themselves) to work under Al Qaeda's direction and control, knowing that Al Qaeda has engaged or engages in terrorist activity, in

13

violation of 18 U.S.C. § 2339B; (2) conspiracy to provide material support by agreeing to provide personnel (including themselves), knowing and intending that they were to be used in preparation for and in carrying out a violation of 18 U.S.C. §§ 844(f)(1) and (i), and to conceal and disguise the nature, location, source, and ownership of such material support, all in violation of 18 U.S.C. § 2339A; (3) conspiracy to maliciously damage and destroy by means of an explosive a building leased to an agency of the United States (the FBI) and a building used in interstate and foreign commerce (the Sears Tower), all in violation of 18 U.S.C. § 844(n); and (4) conspiracy to levy war against the Government of the United States and to oppose by force the authority thereof in violation of 18 U.S.C. § 2384.

The defendants pled not guilty, and three trials ensued. The first trial began on September 18, 2007. On December 13, 2007, that jury acquitted Lemorin on all counts, but was unable to reach verdicts as to the remaining defendants, and the district court declared a mistrial. The second trial began on January 22, 2008. That trial also ended, on April 16, 2008, with the jury unable to reach verdicts on any of the counts as to the remaining defendants, and the district court again declared a mistrial. The third trial began on January 27, 2009. Much of the government's evidence consisted of taped conversations recorded by the confidential informants, Abbas and Assaad, as well the one conversation recorded

14

by Master Athea.  After approximately three months of trial, the case was sent to the jury for deliberations on Monday, April 27, 2009.  One juror was dismissed due to illness on Thursday, April 30, 2009, and the jury was reconstituted.  Another juror was dismissed on Tuesday, May 5, 2009 after the district court determined that the juror was unwilling to follow the court's instructions on the law.  The jury was reconstituted again.  On May 12, 2009, the reconstituted jury returned a verdict convicting Batiste on all counts, convicting Abraham on Counts 1–3 and acquitting him on Count 4, convicting Augustin, Phanor, and Augustine on Counts 1 and 2 and acquitting them on Counts 3 and 4, and acquitting Herrera on all counts.

## II.

Batiste and Augustine challenge the district court's order granting in part the government's motion to strike portions of the indictment as surplusage.  We review a district court's decision on a motion to strike surplusage from an indictment for an abuse of discretion.  United States v. Awan, 966 F.2d 1415, 1426 (11th Cir. 1992).

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."  U.S. Const. amend. V.  "A fundamental principle stemming

15

from this amendment is that a defendant can only be convicted for a crime charged in the indictment. It would be fundamentally unfair to convict a defendant on charges of which he had no notice." United States v. Ward, 486 F.3d 1212, 1226 (11th Cir. 2007) (quoting United States v. Keller, 916 F.2d 628, 632–33 (11th Cir. 1990)). This Court "consider[s] an indictment to be constructively amended when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." Id. (citation and quotation marks omitted). But "Congress defines the elements of an offense, not the charging document." United States v. Deverso, 518 F.3d 1250, 1258 n.2 (11th Cir. 2008). So, "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." United States v. Miller, 471 U.S. 130, 136, 105 S. Ct. 1811, 1815 (1985). Thus, "allegations that are unnecessary to an offense that is clearly contained within [the indictment]" may be stricken by amendment. Id. at 144, 104 S. Ct. at 1819. Yet, while "mere surplusage may be deleted from an indictment without error," it is error when the amendment "impermissibly broaden[s]" the indictment. United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995).

16

On December 19, 2007, shortly after the first trial, the government moved to strike from the indictment any references to Lemorin and certain allegations—namely, the General Allegations section of the indictment and several of the enumerated overt acts—claimed to be surplusage. On February 21, 2008, the district court granted in part and denied in part that motion. Specifically, the district court granted the motion to strike the references to Lemorin, as well as two paragraphs in the General Allegations describing the Sears Tower and the Miami Field Office of the FBI. The district court also granted the motion to strike several of the overt acts listed in the indictment, because the indictment never said that any of the defendants committed all of the overt acts. Instead, the original indictment said only that at least one of the defendants committed at least one of the overt acts. In the revised indictment, several overt acts remained. Thus, the district court concluded that omitting some but not all overt acts narrowed rather than broadened the indictment. Finally, the district court granted the motion to strike sentences further describing Al Qaeda's leadership and membership, and its designation by the Secretary of State as a "foreign terrorist organization" under the Immigration and Nationality Act.[4]

---

[4] The district court denied the motion to strike a paragraph from the General Allegations defining the term "jihad," as well as a sentence in that section stating that "[t]he name 'al Qaeda' is used by an international terrorist group which is dedicated to opposing non-Islamic

17

Batiste argues that the district court abused its discretion in granting the government's motion because Federal Rule of Criminal Procedure 7(d) provides only that a defendant may seek to strike surplusage from an indictment. That rule states that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). Batiste submits that "[t]he Federal Rules thus provide no vehicle by which the government may move to strike as 'surplusage' language from an indictment returned by a grand jury." We do not agree. This Court and the Supreme Court have both recognized that the government may move to strike surplusage from an indictment. See Miller, 471 U.S. at 133, 144, 105 S. Ct. at 1813, 1819 (explaining that the government may strike "allegations that are unnecessary to an offense that is clearly contained within [the indictment]"); Cancelliere, 69 F.3d at 1120–21 (indicating that upon the government's motion, "mere surplusage may be deleted from an indictment without error").[5]

---

governments by encouraging and promoting jihad."

[5] Batiste also states, in conlusory fashion, that the changes to the indictment "substantially and impermissibly altered the charging document." This argument is so conclusory that it might properly be considered abandoned. See Auto-Owners Ins. Co. v. Se. Floating Docks, Inc., 632 F.3d 1195, 1207 n.7 (11 th Cir. 2011). Nevertheless, we do not agree that the striking of the challenged language here impermissibly broadened the indictment. As the district court observed, many of the overt acts remain. As such, we conclude that the changes to the indictment did not alter the elements of the charged offenses.

18

We also reject Augustine's argument that the amendment to the indictment violated the Treason Clause. The Treason Clause of Article III of the Constitution provides that

> Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

U.S. Const. art. III, § 3, cl. 1. Augustine argues that all four counts against him fall within the scope of the Treason Clause, which he contends was violated by the striking of the overt acts and the portion of the General Allegations stating that Al Qaeda members take an oath. We understand Augustine to argue that the offenses implicate the Treason Clause and that therefore the indictment should have kept the allegations regarding the taking of an oath. Augustine makes this same argument with respect to the jury instructions as well.

First, we observe that the amended indictment retained the allegations regarding Augustine's oath of allegiance to Al Qaeda, and thus, even under Augustine's legal theory, the amendment did not broaden the indictment. Beyond that, we have previously explained that "Congress defines the elements of an offense, not the charging document." Deverso, 518 F.3d at 1258 n.2. With that in mind, we note that neither § 2339A nor § 2339B—the two statutes under which

19

Augustine was convicted—include allegiance to the United States as an element of the offense. See 18 U.S.C. §§ 2339A, 2339B. Thus, we have no trouble concluding that these offenses, as defined by Congress, do not fall within the ambit of the Treason Clause. See United States v. Rahman, 189 F.3d 88, 113 (2d Cir. 1999) (explaining that the "requirement that the defendant owe allegiance to the United States" is "an element necessary to conviction of treason"); United States v. Rodriguez, 803 F.2d 318, 320 (7th Cir. 1986) (stating that treason "can only be committed by someone owing allegiance to the United States"); see also 18 U.S.C. § 2381. We conclude that the district court did not abuse its discretion to the extent that it granted the government's motion to strike surplusage from the indictment.

III.

Augustin, Phanor, and Augustine, who were convicted only on Counts 1 and 2, each challenge the sufficiency of the evidence supporting their convictions. We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in the government's favor. United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011). "[T]he jury is free to choose . . . among the reasonable conclusions to be drawn from the evidence

20

presented at trial," but speculation by the jury is not enough to sustain a conviction based on circumstantial evidence. Id. at 1291 (quotation marks omitted).

A.

We begin by reviewing the statutory provisions relevant to Counts 1 and 2. Count 1 alleged a violation of 18 U.S.C. § 2339B, while Count 2 alleged a violation of § 2339A. Section 2339B(a)(1) provides:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization [by the Secretary of State under section 219 of the Immigration and Nationality Act], that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism . . . .

Section 2339A(a) provides:

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 844(f) or (i) . . . of this title, . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both . . . .

Section 844(f)(1) states:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed

21

by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

Section 844(i) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . .

Under both § 2339A and § 2339B,

> the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); see 18 U.S.C. § 2339B(g)(4). Section § 2339B(h)

provides, however, that

> [n]o person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its

22

goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

Finally, 18 U.S.C. § 2339B(i) states that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment."

### B.

With respect to their convictions under Count 1, Augustin, Phanor, and Augustine first argue that the evidence was not sufficient to prove that they intended to conspire to provide material support to Al Qaeda in the form of their personal service to Al Qaeda, because they were acting "entirely independently of the foreign terrorist organization to advance its goals or objectives." See 18 U.S.C. § 2339B(h).[6] Viewing the evidence in favor of the verdict, as we must, we cannot agree. At the oath ceremony, Assaad presented the videotaping of the Miami FBI building as something that would provide critical support for an Al Qaeda mission to attack that building. Phanor and Augustine were then seen photographing and videotaping the federal courthouse complex and federal detention center in downtown Miami (which Batiste had mistakenly believed to be a second FBI building). Further, Augustin was present when Batiste presented the

---

[6] Augustine does not refer to the statutory language specifically, but he argues that there was no evidence that he was "going to operate under the direction of Al Qaeda."

photographs to Assaad and discussed the photographs and the possible methods of attack with him, and again when the photographs and FBI building plot were discussed at a later meeting. On this basis, it was reasonable for the jury to conclude that Augustin, Phanor, and Augustine conspired to act—in participating in the photographing of the FBI building—under the direction and control of Al Qaeda.

Neither does the fact that Assaad acknowledged that Batiste had command of the group undermine this conclusion. Under the totality of the evidence presented, the jury was free to conclude that Augustin, Phanor, and Augustine, though immediately under Batiste's command, were ultimately volunteering themselves to serve under the direction and control of Al Qaeda. See 18 U.S.C. § 2339B(h) ("Individuals who act *entirely* independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." (emphasis added)). We recognize that after the reading and recitation of the oath, Assaad said to the group: "we are not controlling the Moors . . . [y]ou have your leader here." This is certainly evidence favorable to the appellants. But this statement alone did not preclude the jury from finding that Augustin, Phanor, and Augustine were attempting to work under Al Qaeda's direction or control.

24

Instead, the jury was free to conclude, from the entirety of the oath ceremony, including the revelation of the plan to blow up FBI offices across the country, and the appellants' later actions in taking photographs and video footage of the Miami federal buildings and presenting them to Assaad, that Augustin, Phanor, and Augustine had volunteered to work under Al Qaeda's direction or control. See Friske, 640 F.3d at 1291 ("[T]he jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." (quotation marks omitted)).

Augustine and Phanor argue that the photographing of the federal buildings from publicly accessible vantage points does not constitute material support. Specifically, Phanor argues that the logic of Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2723–24 (2010), which explained that § 2339B barred only speech imparting a specialized skill or communicating specialized knowledge—should also be applied to conduct, such that the unskilled conduct of taking photos of federal buildings from vantage points accessible to the public should not constitute material support under § 2339B. Humanitarian Law Project does not support this application. The plaintiffs in Humanitarian Law Project "want[ed] to speak to [designated foreign terrorist organizations], and whether they [could] do so under § 2339B depend[ed] on what they sa[id]." Id.

25

Consequently, the Supreme Court concluded that in that case "§ 2339B regulate[d] speech on the basis of its content." Id. at 2723. The Supreme Court explained that although § 2339B "may be described as directed at conduct," more rigorous scrutiny applied because "the conduct triggering coverage under the statute consists of communicating a message." Id. at 2724. But that is not the case here. Instead, whether Augustine and Phanor violated § 2339B turns on what they did, rather than what they said. Specifically, the question in this case is whether their participation in the oath ceremony, during which the plot against the Miami FBI building was revealed, and their involvement in the subsequent photographing and videotaping of the federal buildings, was sufficient evidence that they volunteered themselves to assist Al Qaeda in planning attacks on federal buildings. Thus, Humanitarian Law Project does not control our determination of whether the conduct at issue here constituted material support.

Beyond this, while we agree with Augustine and Phanor that the recorded images themselves would not actually have been material in furthering the proposed plot to attack the federal buildings, we nevertheless conclude that Augustine and Phanor's volunteering of their service to Al Qaeda was sufficient for a jury to deem it material support in the form of personnel. Section 2339B(g)(4) makes clear that providing personnel, which means "[one] or more

26

individuals who may be or include oneself," constitutes material support under § 2339B. On the basis of the oath ceremony, where the plot against the Miami FBI building was disclosed, and Augustine and Phanor's later participation in recording images of the federal buildings, the jury was entitled to infer that Augustine and Phanor volunteered their service to Al Qaeda generally, and thereby conspired to provide material support under § 2339B.

Augustine and Phanor also point to evidence that they did not really take the oath. Augustine argues that the record indicates that in reciting the oath, he actually changed the words such that he stated his allegiance to himself, rather than to Al Qaeda. Similarly, Phanor argues that he initially refused to take the oath, and only did so after being assured by Batiste that it was "alright" for him to do so. However, we do not find the inadequacies or hesitations in the recitation of the oath to inoculate these defendants from the jury verdict. Instead, it is Augustin, Phanor, and Augustine's participation in the ceremony itself, and their resulting awareness of the plot against the Miami FBI building—rather than the particular words uttered by any given defendant—that is sufficient evidence supplying knowledge and intent to their later participation in the photographing

27

and videotaping of the federal buildings.[7]

Neither are we persuaded by Augustin's argument that the oath ceremony was not sufficient evidence of his intent because the taking of the oath was motivated by a desire to obtain money from Assaad. He argues that "an oath taken for money is a meaningless gesture," because it does not establish allegiance to a cause. But allegiance to a cause is not an element of § 2339B. A jury could find that by volunteering his service to Al Qaeda—whether for financial or other reasons—Augustin conspired to provide material support to a foreign terrorist organization in violation of § 2339B. Thus, we conclude that the government produced sufficient evidence to support Augustin, Phanor, and Augustine's convictions under Count 1.[8]

_____

[7] Phanor further argues that the government failed to establish that he knew that Al Qaeda "[was] a designated terrorist organization," "engaged or engages in terrorist activity," or "has engaged or engages in terrorism." 18 U.S.C. § 2339B. However, as the government observes, there is ample circumstantial evidence of Phanor's knowledge of Al Qaeda and its terrorist activities. For example, on March 9, 2006, a week before the oath ceremony, Batiste and Assaad discussed—in Phanor's presence—Batiste's desire to ally his group with Al Qaeda. Even to the extent that Phanor might not have previously known what sort of organization Al Qaeda was reputed to be, a jury could certainly infer that he became aware that Al Qaeda engaged in terrorist activities when Assaad presented an Al Qaeda plan to blow up FBI buildings in five American cities. From this evidence, the jury could find beyond a reasonable doubt that Phanor was aware that Al Qaeda was a terrorist organization.

[8] Augustin also argues the November 7, 2005 recorded conversation with Abbaas—in which he discussed the group's "plan" for "jihad" to "destroy" the "devil"—was protected speech which was never acted upon. He argues that § 2339A and § 2339B punish acts rather than speech. See 18 U.S.C. § 2339B(i) ("Nothing in this section shall be construed or applied as to abridge the exercise of rights guaranteed under the First Amendment."). Similarly, Augustine

With respect to Count 2, we first observe that it is not clear that the definition of personnel provided under § 2339B applies equally to § 2339A. Indeed, the terms of § 2339B(h)—insofar as they refer to "foreign terrorist organization[s]"—do not fit neatly with § 2339A, which does not expressly require the involvement of a "foreign terrorist organization."  See United States v. Stewart, 590 F.3d 93, 118 & n.21 (2d Cir. 2009) (observing that the definition of personnel provided by § 2339B(h) does not apply to § 2339A).  However, even if we assume that the principles contained in § 2339B(h) apply to § 2339A, we conclude that the evidence is sufficient to support the convictions under Count 2 insofar as the jury could reasonably find that Augustin, Phanor, and Augustine were under the direction and control of the person carrying out the Sears Tower plot—that is, Batiste.  The jury evidently rejected Batiste's contention that the Sears Tower plot was simply a ruse to deceive Al Qaeda.  Thus, the jury's conclusion that Augustin, Phanor, and Augustine had furnished material support in the form of personnel (i.e, themselves) was reasonable given (1) the evidence

argues that § 2339B(i) prevents his conviction under § 2339B on the basis of his study of the Qur'an and his membership in the Moorish Science Temple.  However, in light of our conclusion that Augustin's and Augustine's convictions under § 2339B are sufficiently supported by the evidence relating to the oath ceremony, and Augustin's and Augustine's later involvement in the photographing of the Miami federal buildings and the presentation of those images to Assaad, we need not address these additional arguments that other evidence could not be relied on to support the convictions.

29

showing that Batiste freely, elaborately, and frequently discussed the plot (particularly in December 2005); (2) the abundant evidence of Augustin, Phanor, and Augustine's allegiance to Batiste; and (3) the evidence that Batiste considered Augustin, Phanor, and Augustine members of his inner circle and included them in other similar activities, including the Al Qaeda oath ceremony.

We recognize that the evidence supporting Augustin's, Phanor's, and Augustine's convictions on both Count 1 and Count 2 is far from overwhelming. Indeed, two juries failed to convict on these counts. But those juries also failed to acquit. Ultimately, with the benefit of three months of testimony and over five days of deliberation, the third jury arrived at a verdict, distinguishing between the various defendants and various counts. We cannot say that the jury was unreasonable in concluding that the government carried its burden of proving beyond a reasonable doubt that Augustin, Phanor, and Augustine violated § 2339A and § 2339B as charged.

## IV.

Augustin argues that the government's involvement in the criminal scheme was outrageous and therefore violated the Due Process Clause of the Fifth Amendment. Ordinarily, we review <u>de novo</u> whether the government's investigatory techniques constituted outrageous conduct. <u>United States v.</u>

Edenfield, 995 F.2d 197, 200 (11th Cir. 1993). But where, as here, the

"outrageous governmental conduct" argument was not raised in the district court,[9]

this Court reviews the issue only for plain error. United States v. Kelly, 888 F.2d

732, 739 & n.12 (11th Cir. 1989).[10]

Augustin "argues that his conviction violated the Due Process Clause . . . by

reason of the Government's overinvolvement in the case." The Supreme Court

and this Court have both "recognized the possibility that a conviction may be

overturned where government involvement in criminal schemes is so extensive

that it may be characterized as 'outrageous.'" Owen v. Wainwright, 806 F.2d

1519, 1521 (11th Cir. 1986). But "[g]overnment involvement in criminal schemes

is constitutionally impermissible only where it violates fundamental fairness,

shocking to the universal cause of justice." Id. (quotation marks omitted); see

also Edenfield, 995 F.2d at 200 ("[I]n the rarest and most outrageous

circumstances government conduct might violate that fundamental fairness,

---

[9] Augustin adopted Phanor's motion to dismiss the indictment, which did not raise the issue of outrageous government conduct.

[10] We recognize that non-jurisdictional arguments "alleging a defect in instituting the prosecution" are waived unless raised by motion prior to trial, absent good cause for the failure. Fed. R. Crim. P. 12(b)(3)(A); see United States v. Suescun, 237 F.3d 1284, 1288 (11th Cir. 2001). Nevertheless, for the purposes of this opinion, we will assume where an outrageous governmental conduct challenge was not raised at trial, we may still review the issue for plain error on appeal. See Kelly, 888 F.2d at 739 & n.12.

31

shocking to the universal sense of justice mandated by the due process clause of the fifth amendment." (quotation marks omitted)). Thus, "[e]xtreme circumstances of outrageous government conduct must be shown before a court will find a due process violation." Owen, 806 F.2d at 1522. "In reviewing charges that official conduct rose to a constitutionally impermissible level, the cases turn on the totality of the circumstances without any single controlling factor." Id. at 1521.

Here, we cannot say that the government's conduct was so "shocking to the universal sense of justice" that it was plain error for the district court to refuse to dismiss the indictment. Edenfield, 995 F.2d at 200. The evidence in this case does not show that the government ran "the entire operation with only meager assistance from the [appellants]." Id. Rather, the government only provided means to those who were "willing and predisposed." United States v. Ciszkowski, 492 F.3d 1264, 1271 (11th Cir. 2007). This comports with the basic requirements of the Due Process Clause. Id. We reiterate that the defense of outrageous government conduct can be successfully invoked only in "the rarest and most outrageous [cases]." United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984). After careful review, we are unable to say that this is such a case.

V.

Batiste and Abraham challenge several of the district court's evidentiary rulings relating to the admissibility of lay and expert testimony. We review the district court's evidentiary rulings for an abuse of discretion. United States v. Bradley, 644 F.3d 1213, 1270 (11th Cir. 2011). However, "[e]ven if a ruling constitutes an abuse of discretion, it will result in reversal only if the . . . error was not harmless." Id. (quotation marks omitted) (ellipsis in original). "An error is harmless unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." Id. (quotation marks omitted) (alteration in original). In other words, "nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a substantial influence on the outcome of the proceeding." Id. (quotation marks omitted).

## A.

First, Batiste argues that the district court erred in admitting some of Special Agent Anthony Velazquez's testimony because it was impermissible expert testimony about Batiste's criminal intent. Under Federal Rule of Evidence 704(b), no expert witness "may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704(b). Thus, "[e]xpert testimony expressly stating an opinion as to the defendant's state of mind at the

33

time of the offense is barred by rule 704(b)." United States v. Alvarez, 837 F.2d

1024, 1031 (11th Cir. 1988). But this prohibition does not require the exclusion of

expert testimony that supports an obvious inference with respect to the defendant's

state of mind if that testimony does not actually state an opinion on this ultimate

issue, and instead "le[aves] this inference for the jury to draw." Id.

Here, Agent Velazquez was permitted to testify as to how the contents of

the various recorded conversations and other evidence involving Batiste impacted

the course of the investigation.[11] Batiste argues that "his defense was that he was

---

[11] The following three examples are illustrative of the type of the testimony given by Agent Velazquez.

Example 1:

Q:     Now, at the end of the clip . . . when Elie Assaad says, "What's your plan?" and Batiste says, "To build Islam Army" and then further down, "an Islamic Army for Islamic jihad," what effect did that have on this investigation?

A.     The effect that it had was it further established what Batiste's intentions were, which was to build an organization by recruiting members from the local community and determining which of those members would be trusted with the ultimate objectives, which was to—which was advocating the overthrow of the United States Government and waging some kind of war in the streets.

Example 2:

Q:     Agent Velazquez, at the beginning of this clip, where Narseal Batiste says, "It has to be more than just a bombing. It has to be a real ground war 'cause somehow or other you got to get the civilians, you have to get the people involved, make them go crazy," what effect did that statement have on your investigation, if any?

A:     It basically established that Batiste is laying out his business model for what his intentions and the ultimate intentions of his organization are, which is the overthrow of

34

simply pretending to conspire with the purported terrorist[s], and posturing for the purpose of ripping them off, or scamming them out of money." As such, he claims that the jury at the third trial was tasked with deciding whether he "meant what he said." He argues that Agent Velazquez testified, in violation of Rule 704(b), that Batiste's true intent was to commit the charged offenses.

We do not find this argument convincing. We note that Agent Velazquez was not asked to testify directly to the state of mind of Batiste. Instead, he was asked about the effect of Batiste's statements on the course of the investigation. In other words, Agent Velazquez testified as to what an observer perceiving Batiste's outward manifestations would take to be Batiste's intentions—and not what Batiste's actual state of mind was. We acknowledge that this is a very fine line. In light of the specific questions that prompted the challenged testimony, however, we are confident that Agent Velazquez left the ultimate issue of Batiste's state of

---

the U.S. Government by creating a civil war, if you will, [by] creating chaos and confusion in the streets.

Example 3:

Q: What effect did this list, requesting these types of weapons, have on your investigation?

A: It further established that we needed to continue validating information we were receiving, as we did with the follow-up of the items on the list, and gather more information on other members of Batiste's organization and the extent to which he had access to other parts of the country and other people.

35

mind for the jury to decide. See Alvarez, 837 F.2d at 1031. We therefore conclude that the testimony did not violate Rule 704(b).

Batiste also argues that this lay opinion testimony was not relevant, except for the impermissible purpose of proving Batiste's criminal intent. We reject this argument as well. Agent Velazquez's testimony as to his perceptions of Batiste's intent was relevant, as the phrasing of the questions suggests, to show why the law enforcement agents responded to Batiste's statements in the way that they did. Specifically, this evidence helped to establish that the agents were responding to Batiste's actions and statements, rather than leading Batiste to act in a way that he was not inclined to. We conclude that the district court did not abuse its discretion in permitting this testimony.

B.

Next, Batiste and Abraham challenge the district court's decision to qualify Dan Young as an expert in gangs and allow him to testify about Jeff Fort. Under Federal Rule of Evidence 702,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to

36

the facts of the case.

Fed. R. Evid. 702. Thus, in determining whether a proffered expert is qualified under Rule 702, trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert[ v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). But "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. at 1261 (emphasis omitted).

In this case, Agent Young testified, as an expert, that Jeff Fort—the man Batiste compared himself to in one of the recorded conversations—was the leader of a Chicago group, influenced by the Moorish Science Temple, known as the Almighty Black P. Stone Nation or the El Rukns. Agent Young testified about the structure of that organization, and stated that Fort sought support and military equipment from the government of Libya and was convicted for conspiring to

37

shoot down an airplane in exchange for two million dollars. In a later written order on the motion in limine, the district court explained that "Young's extensive experience with [Fort's organization] and other Chicago street gangs makes his testimony as to their organization, history, symbols, etc. a reliable source of his expert opinion," and that this testimony was "relevant in educating the jury as to the background and significance of Defendant Batiste's statements regarding Jeff Fort, his involvement with the Black Stone Rangers, and his alleged use of gang symbols and codewords."

Abraham and Batiste argue that Agent Young was not qualified to give this testimony. Specifically, Batiste argues that Agent Young did not have sufficient experience to testify as an expert on the Black P. Stones, the El Rukns, or Jeff Fort. To that end, Batiste points out that Agent Young began his career with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in 1989, just as Jeff Fort's activities in Chicago were coming to an end with his conviction in the late 1980s. As a result, Young's knowledge came from law enforcement reports generated by the ATF, Chicago police, and an article by a University of Chicago professor.

We reject Batiste's and Abraham's assertion that the district court erred in qualifying Agent Young as an expert. Agent Young's expertise for the purposes of this trial did not need to extend to every detail and intricacy particular to Fort's

personal history and organization. Agent Young's experience included fifteen years with the ATF specializing in Chicago street gangs, during which he participated in extensive interviewing and investigation of gang members from the El Rukns and other gangs. Agent Young also acted as a nationwide consultant in over fifty investigations, prosecutions, and sentencings of members of the Black P. Stones, and was consulted for a television documentary series on Chicago street gangs, including Jeff Fort and the Black Stone Rangers. We note that Federal Rule of Evidence 702 does not define an expert "in a narrow sense." Fed. R. Evid. 702 advisory committee's note. In light of the substantial experience that Agent Young had with respect to street gangs, we conclude that the district court was within its discretion in determining that Agent Young was qualified to give expert testimony about Jeff Fort and his organization.

Batiste and Abraham also argue that the testimony had a minimal probative value and was highly prejudicial. They argue that Batiste's one reference to Fort over the course of hundreds of hours of recorded conversations made Agent Young's testimony minimally relevant, and that this evidence—given as expert testimony—prejudiced Batiste by equating him with Fort and the El Rukns gang. Batiste elaborates that his single reference to Fort did not suggest that his knowledge about Fort approached the level of detail presented in Agent Young's

39

testimony. He argues that the district court erred in refusing to accept his stipulation to a more limited and less prejudicial description of Fort. As a result, Batiste argues that he was placed in a Catch-22 as he was forced to decide between two unattractive options: he could either emphasize Fort's violent history—compared to Batiste's peaceful one—to distinguish himself from Fort, or ignore Fort's violent past and let the comparison between himself and Fort go essentially unchecked.

After examination of the record, we reject Batiste's characterization. The explanation of Jeff Fort's significance became relevant upon the admission of the recording of Batiste's first meeting with Assaad, during which Batiste likened himself to Fort. Once this came into evidence, the district court was within its discretion in admitting Agent Young's testimony about Jeff Fort and the El Rukns. Neither do we view this evidence as unduly prejudicial. See Fed. R. Evid. 403 (requiring exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice"). To the extent that Batiste wanted to distinguish himself from Fort, he could have done so on cross-examination. It was not Agent Young's testimony that placed Batiste in a Catch-22. Rather, Batiste's own comparison of himself to Jeff Fort was evidence favorable to the government that he could not easily avoid. We recognize that the district court

40

could have limited Agent Young's testimony further to mitigate the concerns Batiste and Abraham raise, but viewing these rulings, as we are required to, through the abuse of discretion standard, we cannot say that the district court committed error by these rulings.

C.

Batiste also argues that the district court erred in prohibiting him from presenting lay opinion testimony from Lance Williams. On the second day of his defense, Batiste offered the lay testimony of Williams, who had not been listed as an expert witness prior to trial. The defense intended to offer Williams—a Professor of Inner City Studies who was not a gang member, but who grew up around them in Chicago, and whose father was a gang member—to testify (in response to Agent Young's testimony) that certain words attributed to gangs were actually common slang in urban Chicago. After hearing a proffer of Williams's testimony, and considering argument from the parties, the district court ruled that Williams could not testify as a lay witness (1) on gang terminology that was part of common language in Chicago, outside of gang circles, (2) that the word "Mo" was used popularly, and (3) that people who were not related, or only marginally related to gangs, were affected by or interacted with gang culture.

Batiste argues that the district court erred in limiting Williams's testimony

because the testimony was based on perception, not specialized knowledge. We reject this argument as well. A lay witness is permitted to provide opinion testimony only to the extent that it is "rationally based on the perception of the witness" and "helpful to a clear understanding of . . . a fact in issue." Fed. R. Evid. 701. A lay witness, however, cannot provide opinion testimony that is "based on scientific, technical, or other specialized knowledge." Id. The record reveals that the district court took care to ensure that Williams was able to testify on the basis of perception, as Rule 701 permits, while only excluding testimony that required specialized knowledge. Specifically, the court permitted Williams to testify "to his observations of how [Fort's gang] dressed," and "to hearing the term 'Mo' being used by non-gang members," but not "as to the transition of the term 'Mo' from gang members into the lexicon of popular culture in communities in Chicago."[12] Likewise, Williams was not allowed to testify "as to gang terminology becoming part of a popular culture in Chicago communities and becoming part of slang and social interaction." Williams was also prevented from testifying that young people who have marginal or no participation in street gangs are nevertheless affected by them. But Williams was allowed to testify "that, as a

[12] In the proffer, Williams stated that "'Mo' is a term associated with the Moorish Science Temple of America." He stated that it "is also used among members of Blackstone Rangers," but that it is also "a popular term in communities in Chicago."

42

young man, he referred to gang members as 'Folks' and as 'People,'" and "as to whether or not there were flags displayed in the exterior of the headquarters of Jeff Fort." The district court thus carefully distinguished between proper lay testimony based on perception, and impermissible opinion testimony based on expertise. We therefore conclude that the district court did not abuse its discretion in excluding the portions of Lance Williams's testimony described above.[13]

## VI.

Batiste offers several arguments relating to limitations on his cross-examination of witnesses, which he contends resulted in cumulative error requiring a new trial. As explained above, we review the district court's evidentiary rulings for an abuse of discretion, but will reverse only if "the error may have had a substantial influence on the outcome of the proceeding." Bradley, 644 F.3d at 1270 (quotation marks omitted). However, "[e]ven where individual

---

[13] Batiste also argues that it was error to exclude testimony recounting the manner and dress of the Moorish Science Temple as hearsay, because this evidence was not offered to prove that the individuals who held themselves out to be members of the Moorish Science Temple were actually members, but rather to show how people who held themselves out to be members of the Moorish Science Temple dressed. In response to the government's objection before the district court, however, Batiste's attorney did not argue that this testimony was not offered to prove the truth of the matter asserted—that is, that the individuals were members of the Moorish Science Temple. To the contrary, his attorney argued before the district court that the testimony was relevant for establishing "the conclusion that these were Moorish Science Temple people." As Batiste failed to raise this argument before the district court, we review it now only for plain error. See United States v. Langford, 647 F.3d 1309, 1325 n.11 (11th Cir. 2011). This being the case, and even assuming that this was error, we cannot correct that error in this appeal because the exclusion of this testimony did not affect Batiste's "substantial rights." Id.

judicial errors . . . may not be sufficient to warrant reversal alone, we may consider the cumulative effects of errors to determine if the defendant has been denied a fair trial." United States v. Ladson, 643 F.3d 1335, 1342 (11th Cir. 2011).

Batiste had sought disclosures from the government under Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972) and Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959). The district court granted his request for some of these materials, but Batiste contends that the court denied his attempts to inquire on cross-examination into specific details of immigration benefits Assaad received from the government. Batist also asserts that the district court denied him the opportunity to call an immigration expert to testify about these benefits.[14] Batiste argues these rulings deprived him of his right to effectively cross-examine Assaad, who was one of the most important government witnesses. As the government points out, however, the record reveals extensive cross-examination of Assaad regarding his immigration status and any immigration benefits he received, as well as his relationship with the FBI. Thus, even assuming that the district court erred in some way by limiting the cross-examination or expert testimony, we cannot say that "there is a reasonable likelihood that [the asserted error] affected the

---

[14] Relatedly, Batiste also argues that he was denied information about the payments made by the FBI to or on behalf of the confidential informants.

44

defendant's substantial rights," Bradley, 644 F.3d at 1270, nor can we say such errors would have denied him a fair trial. See Ladson, 643 F.3d at 1342.

Batiste next argues that the district court erred in barring him from questioning Assaad about a polygraph test he failed in 1997. Federal Rule of Evidence 608(b) commits to "the discretion of the [district] court" the determination as to whether specific instances of conduct, "if probative of truthfulness or untruthfulness," may be the subject of cross-examination. Fed. R. Evid. 608(b). We have previously recognized that if the specific instance of conduct that is at issue is "temporally remote," a district court may properly conclude that it is not probative of truthfulness. See United States v. Novaton, 271 F.3d 968, 1006–07 (11th Cir. 2001). The polygraph that is at issue in this case was administered more than a decade before the third trial took place. Beyond that, we have acknowledged that there may be substantial limitations to the reliability of polygraphs. United States v. Henderson, 409 F.3d 1293, 1303 (11th Cir. 2005). Bearing this in mind, we cannot say that the district court abused its discretion in determining that the polygraph was not probative of truthfulness and that therefore, it could not be the subject of cross-examination.

Batiste then argues that his Confrontation Clause rights were violated by admission into evidence of the recording of the conversation with Master Athea,

45

because Master Athea was not available for cross-examination. However, the district court instructed the jury that Master Athea's statements were not offered for the truth of the matters asserted, but rather to provide context for Batiste's own statements. This Court has explained that the Confrontation Clause is not violated by a non-testifying informant's recorded statements when offered only to place the defendant's statements in context. See United States v. Byrom, 910 F.2d 725, 737 (11th Cir. 1990).[15] Because Master Athea's statements were offered only for context, and not for the truth of the matters asserted, their admission did not violate the Confrontation Clause. See United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009) ("There can be no doubt that the Confrontation Clause prohibits only statements that constitute impermissible hearsay.").

In sum, we find that the district court did not commit any errors, let alone ones that cumulatively would require the reversal of Batiste's convictions.

## VII.

Finally, all of the appellants challenge the district court's dismissal of Juror #4 for refusing to follow the court's instructions on the law. A district court's decision to remove a juror is reviewed for abuse of discretion. United States v.

---

[15] The Supreme Court in Crawford .v Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004) recognized that statements not offered for the truth of the matter do not implicate the Confrontation Clause. See id. at 59 n.9, 124 S. Ct. at 1369 n.9.

<u>Register</u>, 182 F.3d 820, 839 (11th Cir. 1999).  Under the Sixth Amendment, "[a]ny criminal defendant . . . tried by a jury is entitled to the uncoerced verdict of that body."  <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241, 108 S. Ct. 546, 552 (1988).  However, Federal Rule of Criminal Procedure 23(b) permits the district court "to excuse a juror for just cause after the jury has retired to consider its verdict."  <u>Register</u>, 182 F.3d at 839.  "'Just cause' exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions."  <u>United States v. Abbell</u>, 271 F.3d 1286, 1302 (11th Cir. 2001), <u>called into doubt on other grounds by Regalado Cuellar v. United States</u>, 553 U.S. 550, 555 n.1, 128 S. Ct. 1994, 1999 n.1 (2008).  However, "[b]ecause of the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification," this Court applies "a tough legal standard."  <u>Id.</u>  Specifically, "[i]n these kind of circumstances, a juror should be excused only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence."  <u>Id.</u>

"Any challenge to the district court's investigation [of juror misconduct] must be viewed in the context of the broad discretion afforded a trial judge confronted with such an allegation of juror misconduct."  <u>United States v. Yonn</u>, 702 F.2d 1341, 1344 (11th Cir. 1983).  "In fact, that discretion extends even to the

47

initial decision of whether to interrogate the jurors." Id. at 1345. "[W]hether a juror is purposely not following the law is a finding of fact that we . . . review for clear error." Abbell, 271 F.3d at 1302–03.

A.

On the afternoon of Friday, May 1, 2009, after the reconstituted jury had been deliberating for about six hours,[16] the jury foreperson sent a note to the district court complaining that "Juror #4 has made up her mind about the trial well in advance of deliberations," and "she feels deliberating is a waste of time." The note complained that Juror #4 "mumbles words that should not be said," which "offend others," and that her conclusions are based not "upon the evidence and the law," but instead on "internal beliefs and feelings," and that this "is unfair to the defendants." The note concludes: "We have spoken to her on numerous ocassions [sic] and it has not helped. Can Juror #4 be removed? Please help Judge!"

About thirty minutes later, Juror #4 also sent a note to the court, in which she explained that the "trial has been very difficult for [her] in the deliberation room." Specifically, she wrote that "[no one] respects my answers, and I feel I'm being attacked everytime I open my mouth." She alleged that one juror had

---

[16] The jury had been reconstituted with an alternate juror the previous day, because the district court dismissed one of the original jurors due to illness.

"threatened to come over the table and stood up as if to." She explained that "I may have said something recently about the law, which was misinterpreted" and led to the foreperson's earlier note. She stated that she "would love to continue [her] service . . . , and see th[e] trial to the end," but she complained: "My stomach is in turmoil every day."

The district court summarized the substance of the notes for the parties, and provided relevant excerpts, but decided not to read the notes in their entirety to the parties at that time, in order to avoid the possibility of revealing information about the jury's deliberative process.[17] After discussing the issue with the parties, the district court decided to instruct the jury again that it must base its decision on the evidence at trial and the law provided in the district court's instructions. The district court also denied various objections to the instructions and motions for mistrial based on the district court's refusal, at that time, to release the full content of the notes. After instructing the jury, the court discharged the jury for the day, with the expectation that the jury would resume deliberations again on Monday

---

[17] At this point, the district court also informed the parties that before the first deliberations began that Monday morning, April 27, 2009, Juror #4 "approached [the courtroom deputy] and indicated to her that she did not want to deliberate, that she just wanted to go in and state her position." The courtroom deputy "referred [Juror #4] both to the instructions and to the foreperson." Thus, Juror #4 "was instructed to proceed to the jury room and commence deliberations with the jurors," and no further concerns were relayed to the court by Juror #4 until the notes arrived on Friday afternoon.

49

morning.

On Monday, however, Juror #4 called the district court, claiming illness, to say she would not be coming in. As the district court later explained: "Upon further inquiry, Juror #4 indicated that she did not have plans to go to the doctor and was vague as to the extent of her illness." That morning, at approximately 10 a.m., the jury foreperson sent another note to the court, which stated that "[b]ased upon comments made by Juror #4, we feel that we need to bring to the Court's attention that it has been deceived." Specifically, the note said: "Late Friday, May 1st, Juror #4 said during deliberations, 'I don't believe in the law.' 'I don't trust the law.'" The note complained that "[r]ather than follow the Court's instructions, this juror does not want to make any decisions based upon the evidence that the prosecution or defense has provided, but rather relies solely upon her feelings." The note concluded with another plea: "We once again plead to the Court to act on our behalf and our desire for these Defendant[s] to receive a fair and just trial, by admonishing or dismissing this juror."

The district court then showed the parties all of the jury's notes. The government moved to dismiss Juror #4 and replace her with an alternate juror, while counsel for the defendants moved for a mistrial. The district court determined that deliberations "ha[d] not been so infected that they cannot

50

proceed," but decided that it was necessary to question the jurors to determine

"whether . . . everyone in that jury room is willing to follow the instructions on the

law, willing to obey the Court's instructions and willing to apply the evidence to

the law." Thus, the court rejected defense mistrial motions based on suggestions

of threats against or undue "cross-examination" of Juror #4,[18] but agreed with the

defense that further inquiry was necessary. After consulting with the parties, the

district court decided to question each juror, in turn, in open court. The district

court used the following format in questioning each juror:

> First, I have a predicate statement that I would say to each juror: I am not asking you nor should you state or reveal either your own opinions or positions on any of the decisions to be made by the jury or the opinions or positions of any other juror. Without telling me what your or any juror's opinion is regarding the charges or evidence in this case. Question No. 1: Is there any juror or jurors who are refusing to deliberate? Followup question if the person says 'yes': What statements, if any, has Juror X made about refusing or being unwilling to deliberate? Question No. 2: Without telling me what your or any juror's opinion is regarding the charges or evidence in this case, is there any juror who is refusing to follow the Court's instructions on the law? Followup: What statements, if any, has Juror X, if there's a positive answer to that question, made about being unwilling to follow the Court's instructions on the law? Next question: Without telling me what your or any juror's opinion is

---

[18] The concern about undue "cross-examination" in the deliberative process was raised by defense counsel upon full disclosure by the court of the foreperson's original note, which said: "[w]hen we or I try to cross-examine [Juror #4] on evidence, her answers are short or nowhere to be found. She does not try to dispute differing opinions. Throughout our discussions, we consistently cross-examine ourselves, trying to make a just decision based strictly on the law and the evidence which has been provided."

51

regarding the charges or evidence in this case, is there any juror who has refused to apply the law to the evidence or the lack of evidence in the case? If there's an affirmative answer: What statements, if any, has Juror X made about being unwilling to apply the law to the evidence or the lack of evidence in the case?

The district court questioned each juror, beginning with the foreperson and going up in numerical order, except Juror #4 was questioned last, as she had not yet arrived. The district court later summarized the other jurors' responses to the court's questions as follows:

> [E]ach juror testified consistently regarding Juror #4's statements about her refusal to follow the Court's instructions or the law. In response to the Court's first question, '[i]s there any juror or jurors who are refusing to deliberate?,' all of the jurors except Juror #9 answered 'yes' and identified Juror #4. In response to the Court's second question, '[w]ithout telling me what your or any juror's opinion is regarding the charges or evidence in this case, is there any juror who is refusing to follow the Court's instructions on the law?,' all of the jurors, except for Juror #3, answered 'yes' and identified Juror #4. In response [to] the Court's third question, '[w]ithout telling me what your or any juror's opinion is regarding the charges or evidence in this case, is there any juror who has refused to apply the law to the evidence or the lack of evidence in this case?,' all of the jurors except Juror #9 answered affirmatively and identified Juror #4. Most importantly, all of the jurors testified that Juror #4 made statements that she did not trust the law, did not believe in the law, or did not agree with the law.

When Juror #4 arrived at the courthouse, the district court questioned her regarding her health, then asked the same questions posed to other jurors, plus the following additional questions:

52

Are you willing or unwilling to follow the law as given to you by the Court? Have you expressed or stated otherwise to the other jurors? Are you willing or unwilling to apply the law to the evidence or lack of evidence in this case? Have you expressed or stated otherwise to the other jurors? Are you willing or unwilling to deliberate with the other jurors? Have you expressed or stated otherwise to the other jurors?

According to the district court, "Juror #4 responded evasively, taking long pauses before giving answers, and never indicated she was being physically threatened." In response to the district court's question about whether she was "willing . . . to follow the law as given to [her] by the Court," Juror #4 responded: "I'm willing to follow the law. But I'm still entitled to my own— you know, what I feel." During the course of questioning, Juror #4 became upset and began crying, and the district court permitted her to return to the jury room for a brief recess. When questioning resumed, Juror #4 acknowledged making a statement "about the law in general" that was "misinterpreted," but insisted that she only meant: "I don't believe everything I hear." The district court asked Juror #4 if she was "willing or unwilling to deliberate with the other jurors," and Juror #4 responded: "I'm really unwilling because I think I'm making myself very ill. This whole situation is making me very ill."

The next day, after considering the parties' arguments, the district court dismissed Juror #4. The Court found the other eleven jurors credible and

consistent, found Juror #4's answers to be evasive and incredible, and found beyond a reasonable doubt that Juror #4 had violated her oath and duty as a juror "to follow the Court's instructions on the law and apply the law to the evidence or lack of evidence." The court found "as a matter of fact that no substantial possibility exists that [Juror #4] is basing her decision on the sufficiency of the evidence, that she does not intend to apply the law as set forth in the instructions by the Court." The court replaced Juror #4 with an alternate juror.

## B.

Batiste argues that "the conduct of the jury and the district court's response to this conduct" violated his "right to an uncoerced, unanimous verdict."[19] Batiste describes the allegation in Juror #4's note that another juror threatened to come across the table as "an assault," and argues that the district court "brushed aside a serious allegation of harm to Juror No. 4" by failing to inquire into this allegation during the voir dire. Batiste also complains that the district court initially withheld the allegation of juror intimidation contained in Juror #4's note from the parties by not disclosing the complete notes when the court received them on Friday afternoon.

---

[19] All of the other appellants also raise the juror removal issue on appeal, making arguments similar to (but generally less exhaustive than) those offered by Batiste.

54

After review, we conclude that the district court did not err in initially withholding the full notes from the parties, nor in declining to ask specific questions about the alleged "assault." In both instances, the district court was concerned about invading the jury's deliberative process. See United States v. Siegelman, 640 F.3d 1159, 1185 (11th Cir. 2011) ("District courts are subject to very stringent limitations on their authority to question jurors about their deliberations . . . ."). Indeed, this Court "has repeatedly emphasized the important policy considerations that require the shielding of juries from public scrutiny of their deliberations." Id. Mindful of those policy considerations, we have "caution[ed] district courts to be careful about invading the secrecy of the jury's deliberations and to err on the side of too little inquiry as opposed to too much." Abbell, 271 F.3d at 1304 n.20. Heeding that warning, the district court in this case declined to reveal the full notes to the parties on Friday afternoon because the court wanted time to consider whether it would be appropriate to divulge that information to the parties. On Monday, when the other eleven jurors sent another note, the district court determined that it was, at that point, appropriate to disclose all the notes to the parties, and immediately did so. Thus, the parties had access to all the notes before the voir dire on Monday. In short, given the district court's proper concern for respecting the sanctity of the jury's deliberative process, we

55

conclude that the district court was within its discretion in initially withholding the full notes from the parties over the weekend, and disclosing them only when the situation appeared to be escalating on Monday.

We also do not agree with Batiste and the other appellants that the district court erred in failing to ask specific questions about the allegation of intimidation during the voir dire. As we observed above, we must afford "broad discretion . . . to a trial judge confronted with such an allegation of juror misconduct," and "that discretion extends even to the initial decision of whether to interrogate the jurors." Yonn, 702 F.2d at 1344–45. Moreover, as we recently explained, "[t]he district court's discretion . . . is at its zenith when the alleged misconduct relates to statements made by the jurors themselves, and not from media publicity or other outside influences." Bradley, 644 F.3d at 1277 (quotation marks omitted). Given our warning that district courts should "be careful about invading the secrecy of the jury's deliberations and . . . err on the side of too little inquiry as opposed to too much," Abbell, 271 F.3d at 1304 n.20, we conclude that the district court acted within its "broad discretion" in asking only general questions that provided Juror #4 with a sufficient opportunity to repeat or elaborate on the allegation of intimidation contained in the note. Bradley, 644 F.3d at 1276.

Batiste further argues that the district court lacked good cause to dismiss

56

Juror #4. He contends that there was a "substantial possibility" that Juror #4's decisions were based on the evidence. In support of his claim that there was evidence that Juror #4 was participating in deliberations, he points to an earlier jury note indicating that the jury was having difficulty distinguishing between two of the counts. Another note requested a transcript. Batiste also points to the district court's recognition that Juror #4 took notes. Batiste argues that this constitutes "ample evidence [that] the jury majority's allegations were based on [Juror #4's] holdout position and particular views on the evidence, rather than on a true refusal to deliberate and follow the law." He contends further that Juror #4's ultimate unwillingness to deliberate, as reflected in her answers at the evidentiary hearing, were the result of the harassment and threats she received in the jury room and not her unwillingness to follow the law and base her decisions on the evidence presented at trial.

The district court here acted within its discretion in removing Juror #4. The district court, consistent with Abbell, first attempted to remedy the problem by re-instructing the jury that it must follow the law as provided by the court. 271 F.3d at 1303–04. The district court dismissed Juror #4 only after problems escalated on Monday, and only after questioning all of the jurors individually. Moreover, the court made a credibility determination as to Juror #4's answers, as well as those of

57

the other jurors, and found beyond a reasonable doubt that Juror #4 was not following the court's instructions on the law and applying the law to the evidence or the lack thereof.  See id. at 1302 (explaining that the inquiry of whether "no 'substantial possibility' exists that [the juror] is basing her decision on the sufficiency of the evidence" is "basically a 'beyond reasonable doubt' standard").  As we have explained, "because the demeanor of the pertinent juror is important to juror misconduct determinations, the district court is uniquely situated to make the credibility determinations that must be made in cases like this one: where a juror's motivations and intentions are at issue."  Abbell, 271 F.3d at 1303.  Partly for that reason, we review a district court's finding that "a juror is purposely not following the law . . . for clear error."  Id. at 1302–03.  In other words, we may set aside a district court's finding only if "we are left with a definite and firm conviction that a mistake has been committed."  United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005).  In light of the consistent answers given by eleven of the jurors, and the vague and evasive answers given by Juror #4, we cannot say that the district court clearly erred in finding that Juror #4 was not willing to follow the court's instructions.  See Abbell, 271 F.3d at 1302–03.  We therefore conclude

that the district court did not abuse its discretion in removing Juror #4.[20]

## VIII.

For all of these reasons, we affirm the appellants' convictions.

**AFFIRMED.**

---

[20] Batiste makes the related argument that the district court erred in failing to declare a mistrial because the other eleven jurors talked about the case with each other outside of the deliberations, as evidenced by the note received from the jury on Monday morning before Juror #4 arrived. While it is perhaps troubling that the Monday morning note arrived before the full jury had reconvened, we cannot say that the district court erred in concluding that there was "no evidence the jury deliberated outside Juror #4's presence." To the extent that the jurors necessarily conferred with each other on Monday morning before sending the note, the record only suggests that they conferred regarding the specific problems they had encountered with Juror #4 as opposed to deliberating about the case. Beyond this, it should be recognized that the other eleven jurors only had this conversation outside the presence of Juror #4 because she failed to come to the courthouse that morning. As such, the district court did not abuse its discretion in refusing to grant a mistrial on this basis.