[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12410
_____

D.C. No. 3:16-cr-00060-BJD-JRK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MATTHEW BRIAN CANIFF,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(February 15, 2019)

Before, MARCUS, NEWSOM, and EBEL,* Circuit Judges.

EBEL, Circuit Judge:

In this direct criminal appeal, Defendant Matthew Caniff challenges his

convictions for three federal child sex offenses.  Having jurisdiction under 28

_____

* The Honorable David M. Ebel, Senior United States Circuit Judge for the United States Court
of Appeals for the Tenth Circuit, sitting by designation.

U.S.C. § 1291, we AFFIRM each conviction.  In doing so, we hold, among other things, that Caniff's text messages asking a person he thought was a minor to send him sexually explicit pictures of herself can support a conviction for making a "notice" to receive child pornography in violation of 18 U.S.C. § 2251(d)(1)(A).

## I. BACKGROUND

The evidence at trial, viewed in the light most favorable to the jury's verdict, see United States v. Dixon, 901 F.3d 1322, 1335 (11th Cir. 2018), cert. denied, 2019 WL 113506 (U.S. Jan. 7, 2019), established the following:  St. John's County, Florida law enforcement initiated an operation to locate individuals who have a sexual interest in children and who were willing to act on that interest.  As part of the operation, FBI Special Agent Abbigail Beccaccio posed as "Mandy," a thirteen-year-old girl, on "Whisper."  Whisper is an online website and cellphone application "that allows users to text or communicate anonymously with other users."  (Aplt. Br. 3.)  Whisper's "terms of use" provide that "individuals who use Whisper must be at least 13 years of age . . . and that if you are between the ages of 13 and 18, that you should be supervised by a parent."  (Doc. 79 at 35-36.)

On the afternoon of March 31, 2016, Agent Beccaccio posted on Whisper a photo of another FBI employee taken when that employee was in her early twenties.  The FBI had "age regress[ed]" that photo to make the person in it look "more childlike and youthful."  (Doc. 79 at 37-38.)  The photo showed "Mandy"

2

dressed in a heavy sweatshirt or coat worn over another shirt; Mandy was not dressed or posed in any sexually suggestive manner.  Agent Beccaccio posted this picture with the words: "Spring Break! And I'm BORED!!!!!!" superimposed over the photo. (Gov't ex. 1.)

Caniff, a thirty-two-year-old pharmacy technician, responded, stating "Let's do something then," followed by a "winky smiling face" (Doc. 79 at 41, Gov't ex. 2 at 1).  Mandy asked if Caniff was on spring break too; he responded that he was "[t]otally off today."  (Doc. 79 at 42-43; Gov't ex. 2 at 2.)  Caniff wanted to "do something water related."  (Gov't ex. 2 at 3.)  Mandy asked Caniff if he was old enough to drive; Caniff said he was; Mandy responded: "Sweet!!  I'm not old enough too [sic]."  (Id. at 4.)  Caniff then asked Mandy if she had a bikini and was it cute.  (Id. at 5.)  Caniff soon agreed with Mandy to leave Whisper and instead text message each other.

Caniff and Mandy exchanged text messages the rest of that afternoon and evening.  Although Mandy told Caniff several times at the outset of their text messaging that she was thirteen years old, Caniff's text messages to Mandy turned sexual and eventually became quite explicit and graphic.  Caniff also sent Mandy several pictures of his penis and asked her to send him pictures of her genitalia and of her masturbating. When Mandy asked if she could get in trouble, Caniff

3

responded that "[t]he only one of us the [sic] could get in trouble would be me."

(Gov't ex. 3 at 3.)  Eventually, Mandy agreed to have sex with Caniff.

Before driving an hour and a half to meet Mandy, who said she was home

alone, Caniff asked Mandy if she was a cop.  She responded, "[l]ike 13 year old

[sic] are cops!"  (Id. at 14.)  Caniff said Mandy "could be pretending to be 13."

(Id.)  Mandy said she was not.  Mandy asked Caniff what he was bringing her; he

said he had Xanax to share with her.  Fate almost intervened for Caniff when his

car broke down on his drive to Mandy.  But he was able to get his car working

again and arrived at Mandy's home at approximately 1:30 a.m. where he was

arrested.

After his arrest, Caniff consented to agents searching his computer, cell

phone and other electronic devices, as well as his vehicle.  Agents found only adult

pornography on Caniff's phone, and no child pornography anywhere.  Caniff also

gave agents information that would enable them to access his social media

accounts; officers found nothing incriminating there, either.  There was Xanax in

Caniff's wallet, which Caniff said he found in the trash at the pharmacy where he

worked.

After giving Caniff Miranda[1] warnings, officers interviewed him.  During

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

that interview, Caniff acknowledged that Mandy had told him she was thirteen, but he stated that on the Whisper "application, it says that you have to be at least 17 or 18 to download,[2] so I assumed that that was the age.  I thought that there was some kind of role-playing going on."  (Gov't ex. 27A at 5 (footnote added); see also id. at 9-10 ("I thought we were role-playing . . . because . . . the site says that you have to be an adult . . . , so I believe that you have to be an adult. . . . I assumed that she was role-playing. . . . I assumed that I wasn't meeting a juvenile.").)

The United States charged Caniff with three offenses: 1) attempting to entice a minor to engage in illegal sexual conduct, in violation of 18 U.S.C. § 2422(b); 2) advertising for child pornography, in violation of 18 U.S.C. § 2251(d)(1)(A) and (2)(B); and 3) attempted production of child pornography, in violation of 18 U.S.C. § 2251(a).  For these federal offenses, a minor is defined as "any person under the age of eighteen years."  18 U.S.C. § 2256(1).  Count 1 relied on Florida law, which defines a minor to be under sixteen years of age.  These offenses required the Government to prove, not that there was an actual child victim, but that Caniff believed he was texting with a minor.  See United States v. Rothenberg, 610 F.3d 621, 626 (11th Cir. 2010) (§ 2422(b)); United States v. Lee, 603 F.3d 904, 913 (11th Cir. 2010) (§ 2251(a)).  At trial, Caniff's primary defense was that he

_____

[2] As noted previously, Whisper only requires users to be thirteen years old or older.  There is no evidence about how, or if, that age restriction is enforced.

5

believed he was, instead, communicating with an adult who was role playing as a thirteen-year-old. The jury rejected that defense and convicted Caniff of each of the three charged offenses. The district court imposed three concurrent fifteen-year sentences, followed by five years' supervised release.

## II. DISCUSSION

**A. Caniff's text messages requesting that Mandy send him sexually explicit photos can support an 18 U.S.C. § 2251(d)(1)(A) conviction for making a "notice" seeking to receive child pornography**

Caniff challenges his Count 2 conviction for violating 18 U.S.C. § 2251(d)(1)(A) and (2)(B), which provides:

> **(d)(1)** Any person who, in a circumstance described in paragraph (2), <u>knowingly makes</u>, prints, or publishes, or causes to be made, printed, or published, <u>any notice or advertisement seeking</u> or offering—
>
> > **(A)** <u>to receive</u>, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct;
> >
> > . . . .
>
> shall be punished as provided under subsection (e).
>
> **(2)** The circumstance referred to in paragraph (1) is that--
>
> > . . . .
> >
> > **(B)** such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce <u>by any means</u> including by computer or mailed.

6

(Emphasis added.)

The trial court, without objection, used the statutory language to instruct jurors that the Government had to prove beyond a reasonable doubt, among other elements, "that the defendant knowingly made, printed, or published or caused to be made, printed, or published any notice or advertisement," and "that such notice or advertisement sought or offered to receive . . . any visual depiction . . . that . . . involved . . . a minor child engaged in sexually explicit conduct." (Doc. 80 at 132-33.) Jurors deliberated for thirty minutes before they sent the court a question, inquiring: "What is the definition of the term 'notice' in Count Two, or should we determine that definition?" (Id. at 144.) The district court discussed the jury's question with counsel and then, without objection, responded to the jury: "You should determine the definition based upon the instructions you have." (Id. at 145.) The jury deliberated another half hour and then returned a verdict convicting Caniff of Count 2, as well as the other two counts.

On appeal, Caniff asserts only a single substantive argument, contending that there was insufficient evidence for a reasonable jury to find that the text messages he sent just to Mandy asking her to send him sexually explicit photos of herself were a "notice or advertisement" for purposes of § 2251(d)(1)(A). We review that argument de novo. See Dixon, 901 F.3d at 1335 (reviewing de novo whether evidence was sufficient to support conviction); see also United States v.

7

Jim, 891 F.3d 1242, 1250-51 (11th Cir. 2018) (addressing statutory construction de novo), petitions for cert. filed (U.S. Jan. 10, 2019) (Nos. 18-891 and 18-895).  We need not decide whether a jury could find that Caniff's text messages were "advertisements" because we conclude, instead, that a reasonable jury could find that those text messages were "notices" which § 2251(d)(1) made criminal.

The parties agree that, because the statute does not define "notice," that term must be given its ordinary or common, everyday meaning.  This is consistent with the approach taken by other circuits addressing similar questions under § 2251(d)(1), see, e.g., United States v. Gries, 877 F.3d 255, 260 (7th Cir. 2017) petition for cert. filed (U.S. Jan. 7, 2019) (No. 18-858); United States v. Franklin, 785 F.3d 1365, 1367-68 (10th Cir. 2015), as well as consistent with the rules of statutory interpretation generally, see Barton v. U.S. Attorney Gen., 904 F.3d 1294, 1298 (11th Cir. 2018) (citing Sebelius v. Cloer, 569 U.S. 369, 376 (2013)), petition for cert. filed, — U.S. — (U.S. Dec. 4, 2018) (No. 18-725).

Black's Law Dictionary defines "notice" to include "[a] written or printed announcement."  Notice, Black's Law Dictionary (10th ed. 2014); see also Notice, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/notice (lasted visited December 12, 2018).  See generally Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2070-71 (2018) (looking to dictionary definition in determining ordinary meaning of a statutory phrase).  Dictionary.com indicates

that a "notice" can be "a note, placard, or the like conveying information or a warning." Notice, htpps://www.dictionary.com/browse/notice (lasted visited December 12, 2018).  The Seventh Circuit noted that Webster's Third New International Dictionary (ed. 2002), similarly defines "notice" to include "a 'warning or intimation of something,'" as does the New Oxford American Dictionary (3d ed. 2010), which defines "notice," inter alia, "as a 'notification or warning of something.'"  Gries, 877 F.3d at 260 (7th Cir.).  A jury could find that Caniff's text messages to Mandy seeking sexually explicit photos fit this common meaning of "notice."

We disagree with Caniff's argument that a "notice" must be sent to the general public or at least to a group of people.  The most common usage of the word "notice" is not limited exclusively to a public or group component.  A notice can, of course, be made to the general public.  Caniff points to such an example of "notice" cited by the Merriam-Webster Dictionary—newspaper notices of marriages and deaths.  But a public component is not, by definition, required.  The Tenth Circuit cited eighteen definitions of "notice" taken from Webster's New Third International Dictionary (1993), noting that none of those definitions required a "public" component.  Franklin, 785 F.3d at 1368.[3]  Thus, "[i]n everyday

---

[3] In Franklin, the Tenth Circuit, nevertheless, assumed for purposes of its analysis, without deciding, that 18 U.S.C. § 2251(d)(1)'s use of the term "notice" had a public component.  785 F.3d at 1369.

9

parlance," notice "is not limited to warnings or notifications disseminated to the general public, and nothing about the context in which [the term notice] is used here [in § 2251(d)] suggests a more limited meaning." Gries, 877 F.3d at 260 (7th Cir.) (bracketed material added).

There are numerous examples where "notice" is given from one individual or entity to another. For instance, a utility company might send an individual customer "notice" that the utility is going to turn off that specific customer's service. Black's Law Dictionary uses the example of a lease's requirement that a tenant give his landlord thirty days' written "notice" before vacating the leased premises. Notice, Black's Law Dictionary (10th ed. 2014). An employee might notify (or give notice to) his boss that the employee will not be at work tomorrow. One might notify a neighbor to get off the lawn or be sued for trespass, and a parent can give notice to a child that if he does not turn down his music, there will be consequences.

These common uses of "notice" do not require the involvement of the public or a group, and there is no indication that Congress intended any different use of "notice" in § 2251(d)(1). In fact, Congress used extraordinarily broad language in this provision. Congress did not include any adjective in § 2251(d)(1) to limit "notice," and certainly did not add "public" to modify "notice" —as one might expect Congress to have done had it wished to exclude private communications

10

from the statute's coverage.  Although this case involves a form of communication that was not in existence when the provision was written, private person-to-person communications have existed as long as the written word.  And reading § 2251(d) to include text messages within its reach fits precisely within the category of statutory language that Justice Scalia has embraced as "encompassingly broad language that comes to be applied to technology unknown when the operative words took effect."  A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 86-87 (2012).

Indeed, instead of limiting the section's application to notice provided to a group or to the public at large, Congress used more expansive language, proscribing "<u>any</u> notice."  (Emphasis added.)  <u>See</u> <u>Gries</u>, 877 F.3d at 260 (7th Cir.) ("The phrase 'any notice or advertisement' in § 2251(d) casts a wide net for this offense.").  As we have often had occasion to say, when interpreting a statute "any" means "all."  Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) ("[T]he adjective 'any' is not ambiguous; it has a well-established meaning. . . . Congress did not add any language limiting the breadth of that word, so 'any' means all." (internal quotation marks omitted)); <u>see also</u> <u>Laperriere v. Vesta Ins. Grp., Inc.</u>, 526 F.3d 715, 726 (11th Cir. 2008) ("[T]he term 'any' in a statute has a 'broad,' 'powerful,' and 'expansive' meaning; it does not mean 'some' or 'all but a few,' but instead means 'all.'") (internal quotation marks omitted); <u>CBS Inc. v.</u>

11

PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001) ("[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (internal quotation marks omitted).  The use of "any" directs us to interpret "notice" as broadly as the word will bear.  Furthermore, § 2251(d)(1)'s language explicitly focuses only on the defendant's conduct in making, printing or publishing a "notice," and does not address at all the audience receiving the notice.

Nor does the phrase "make . . . notice" require a public audience.  Perhaps it's an awkward turn of phrase that one wouldn't use in everyday parlance, but it cannot be described as specifying any particular form of communication.  To the contrary, Black's Law Dictionary defines "make" as "caus[ing] (something) to exist <to make a record>."  Black's Law Dictionary (10th ed. 2014); see also Random House College Dictionary (1982) ("to write or compose, as a poem").  Thus, as the Supreme Court has said, "[w]hen 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb."  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011).  In other words, "to make any notice" simply means "to notify," and Congress did not constrain in any way how the defendant could notify his recipient or recipients that he was seeking child pornography.  See id.

Caniff points out that Congress proscribed "any notice or advertisement,"

12

and advertisement is commonly defined as "public notice." We have no occasion here to address what constitutes an "advertisement" for purposes of § 2251(d)(1). But Caniff's contention—that an "advertisement" is a "public notice"—cuts against his position because it implies that a simple notice without the adjective "public" is still a notice, needing only the addition of a public audience to be elevated to an advertisement. If the common, ordinary use of "notice" inherently requires a public component, as Caniff argues, there would be no need ever to modify notice with the adjective "public." Furthermore, if both notice and advertisement mean "public notice," then these two terms are largely redundant, and we are reluctant to conclude that two separate words in a statute are redundant. Cf. United States v. Harrison, 357 F.3d 314, 315, 321-22 (3d Cir. 2004) (rejecting, in the context of a prior version of U.S.S.G. § 2G2.2(b)(5), that "notice" requires a public audience because "if the meaning of 'notice' comprehended that it was 'public,' it would not be necessary to modify the definition of 'announcement' by designating it as a 'public' notice"), vacated on other grounds, 543 U.S. 1102 (2005). We conclude Congress must have, instead, meant that each of those terms—"notice or advertisement"—had an independent meaning. That is particularly true here because Congress separated the terms notice and advertisement by the word "or." See Loughrin v. United States, 573 U.S. 351, 357 (2014) (rejecting interpretation that statute's two clauses, which were separated by

13

"or," meant the same thing; stating that the "ordinary use" of "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings" (quoting United States v. Woods, 571 U.S. 31, 45 (2013)).[4]

For these reasons, we reject Caniff's argument that "notice" requires a public or group component. Instead, "notice" can commonly and ordinarily include one-on-one communications like the text messages at issue here.[5]

Courts applying similar language in the sentencing guidelines have reached a like conclusion. U.S.S.G. § 2G2.2(c)(1), for example, provides a cross-reference that essentially enhances a defendant's offense level "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct . . . for the purpose of transmitting a live visual depiction of such conduct." (Emphasis added.) Courts have held that for purposes of that sentencing guideline, "notice" includes one-on-one

---

[4] For the first time in response to one of the Government's Fed. R. App. P. 28(j) letters, Caniff directly invokes the statutory interpretative canon "noscitur a sociis" ("statutory terms are often known by the company they keep," Lagos v. United States, 138 S. Ct. 1684, 1688 (2018)), as well as "negative implication," to argue, without any analysis, that "§ 2251(d) requires a public component." (Caniff's Nov. 1, 2018, response.) That argument is not particularly helpful here to define one of two statutory terms. See Franklin, 785 F.3d at 1369 (10th Cir.) (rejecting application of noscitur a sociis to define "advertisement" and "notice" under § 2251(d)). See generally Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 288 (2010) (stating that application of noscitur a sociis canon was not persuasive in that case because "list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating").

[5] Caniff does not assert any other arguments regarding the meaning of "notice," so we address only his "public" component argument.

14

communications as emails and instant messaging.  See United States v. Long, 304 F. App'x 982, 986 (3d Cir. 2008) (unpublished) (holding instant messaging qualified as "notice" for purposes of § 2G2.2(c)'s cross reference).  Long relied on Harrison, in which the Third Circuit held that a prior version of U.S.S.G. § 2G2.2(b)(5), which enhanced an offense level when "a computer was used for the transmission of . . . a notice or advertisement of" child pornography, applied to emails the defendant exchanged with an undercover police officer.  357 F.3d at 315, 321-22.

Our conclusion—that "notice," for purposes of § 2251(d)(1), is broad enough to include individually directed text messages like the ones at issue here— is bolstered by the "comprehensive regulatory scheme" Congress enacted to "criminaliz[e] the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography."  United States v. Parton, 749 F.3d 1329, 1330 (11th Cir. 2014) (internal quotation marks omitted) (addressing § 2251(a)).  When Congress enacted what is now § 2251(d) (which was originally designated as § 2251(c), see United States v. Pabon-Cruz, 391 F.3d 86, 88 n.2 (2d Cir. 2004)), Congress noted that, "[o]f all of the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purposes of producing child pornography."  H.R. Rep. No. 99-910, 99th Cong., 2d Sess. (1986).  Congress's "clear statutory purpose" was to "eradicat[e] the child-

15

pornography market." United States v. Peterson, No. CR 12-228-GW, 2015 WL 13657215, at *5 (C.D. Cal. Mar. 20, 2015) (unreported); see also United States v. Christie, 570 F. Supp. 2d 657, 665 (D. N.J. 2008) (recognizing Congress's "primary intent" in enacting § 2251(d)(1) was "to eliminate the exchange of child pornography"). "Congress surely did not intend to limit [§ 2251(d)(1)'s] reach to pedophiles who indiscriminately advertise through traditional modes of communication like television or radio. Congress was trying to capture all advertisements or notices targeting individuals interested in obtaining or distributing child pornography." Franklin, 785 F.3d at 1369-70 (10th Cir.).

While Congress, in 1986, probably did not imagine the prevalence today of cell phones and the ease with which sexual predators can reach out to individual children to obtain child pornography, the language Congress used in § 2251(d)(1) is broad enough to encompass such conduct. Furthermore, this conduct goes to the heart of Congress's purpose in enacting § 2251(d)(1), to dry up the child pornography market. Once a predator is able to obtain such child pornography texted to him, he can quickly and easily disseminate it to countless others. Proscribing his doing so serves Congress's purpose in enacting § 2251(d)(1).

Through the one-on-one electronic communications at issue here, a sexual predator can more easily isolate and prey on a single vulnerable child victim than if he sent a widely disseminated notice to many potential victims. We cannot

16

imagine that Congress intended to leave such a loophole in its otherwise comprehensive regulation of child pornography. Such a loophole would leave the most vulnerable of the victims of pedophilia unprotected against the most effective and hardest to detect predatory conduct. That would make no sense at all in a statute that was intended to have a broad and comprehensive reach. See Gries, 877 F.3d at 260 (7th Cir.).

For all these reasons, we conclude that Caniff's text messages to thirteen-year-old Mandy asking her for sexually explicit pictures of herself can support the jury finding that he made "notices" that he desired to receive child pornography.

It may have been preferable for the district court here to have provided the jury with a legal definition of "notice." But Caniff did not object to the court using just the statutory terms to instruct the jury, nor did he object to the court's decision to respond to jurors' inquiry during deliberations by indicating that they should determine the definition of "notice." Nor has Caniff argued on appeal that the district court made any legal error in submitting this term to the jury for its determination. That issue is, consequently, not presented to us and we, thus, do not address it in this appeal.

We conclude that, in light of the district court's instructions given here, there was sufficient evidence for the jury to find that Caniff's text messages to Mandy requesting photos of her engaging in sexually explicit conduct were "notices"

17

made criminal under § 2251(d)(1).

## B. There was sufficient evidence for a jury to find that Caniff believed Mandy was thirteen

Caniff next challenges each of his three convictions, arguing that, in light of his defense that he believed that he was text messaging with an adult woman who was role playing the part of a thirteen-year-old, there was insufficient evidence for the jury to find that he believed he was texting a minor. "We review de novo the sufficiency of the evidence, . . . view[ing] the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility choices in favor of the jury's verdict." Dixon, 901 F.3d at 1335 (internal quotation marks and citation omitted).

> We will not reverse unless no reasonable trier of fact could find guilt beyond a reasonable doubt. It is not our function to make credibility choices or to pass upon the weight of the evidence. Instead, we must sustain the verdict where there is a reasonable basis in the record for it.

United States v. Farley, 607 F.3d 1294, 1333 (11th Cir. 2010) (citations, internal quotation marks omitted).

There is a reasonable basis in this record to support the jury's finding that Caniff believed Mandy was a minor. During their exchange of text messages, Mandy expressly told Caniff several times that she was thirteen. See United States v. Rutgerson, 822 F.3d 1223, 1228-30, 1232-33 (11th Cir. 2016) (holding there was sufficient evidence for jury to find defendant believed he was electronically

18

conversing with fifteen-year-old because she told him in her emails and text messages that she was fifteen); United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam) (holding there was sufficient evidence for jury to find that the defendant acted with specific intent to persuade a minor to engage in criminal sexual activity where "both girls told Yost they were under-age multiple times"). In addition, a jury could find that much of Mandy's text messages suggested that she was thirteen—being on spring break, not old enough to drive, and being sexually inexperienced. Furthermore, there was nothing in their text messages that expressly or even inferentially suggested that Mandy was an adult or that either Caniff or Mandy were only role playing.

To be sure, there was some other evidence from Caniff after his arrest where he professed to believe Mandy was an adult who was role playing to be a minor— Caniff's statements to police, for example, during his interview immediately after his arrest—from which the jury could have found instead that Caniff thought Mandy was an adult role-playing as a thirteen-year-old. But at the very most, that sets up conflicting evidence. However, we must on this appeal take the evidence in the light most favorable to the government and ask only if there was enough, if that evidence was believed, to cause a reasonable jury to convict. In light of that, we must uphold Caniff's convictions. See Farley, 607 F.3d at 1300, 1333-34 (holding evidence was sufficient for trial court conducting bench trial to find that

19

defendant who believed he was texting a mother about having sex with her and her

ten-year-old daughter "was 'for real,' and to disbelieve his insistence at trial that it

was all a fantasy"); Yost, 479 F.3d at 819 (holding there was sufficient evidence

for jury to find that defendant had specific intent to persuade minor to engage in

criminal sexual activity, despite his assertion that "he believed he was

communicating with adult women role-playing as minors").

**C. The district court did not abuse its discretion in permitting Detective Greene's challenged testimony**

Lastly, Caniff challenges Detective Greene's testimony regarding the

contents of Caniff's cell phone.  After Caniff's arrest, Detective Greene

interviewed Caniff and searched his cell phone.  On direct examination, the

detective testified that on Caniff's cell phone he found pictures of a penis and the

text messages that Caniff and Mandy exchanged.  During cross-examination,

defense counsel asked Detective Greene if he found anything else on Caniff's cell

phone:

> Q. . . . Other than that, there was nothing else in the phone of any evidentiary value, correct?
>
> A. In reference to this case, no -- or, I mean --
>
> Q. In reference to anything.
>
> A. -- any other case that I knew of, yes.
>
> Q. There was no other illegal activity - - even if that's illegal activity, there was no illegal activity in the phone, correct?

20

A. Correct.

Q. Okay.  There was no child pornography in his phone, correct?

A.  Correct.

Q. There were no chats on his phone that were inappropriate or illegal, correct?

A. Correct.

Q. Okay.  The only thing found on his phone was adult pornography, correct?

A. To the best of my knowledge, yes.

Q. Okay. And nothing illegal with what he had, correct?

A. Correct.

(Doc. 80 at 23.)  On redirect, the prosecutor asked:

Q. Okay.  Now [defense counsel] asked you if there was evidence of any -- I think she said there was no -- she said there was no evidence of any illegal activity in the phone.

Is it your understanding that the text messages are evidence of illegal activity that is what brings us here today?

A. Yes.

[Defense counsel]: Objection, Your Honor.  He's asking for an opinion.  That's the whole issue in this courtroom today.

THE COURT:  Give me just a moment.

I'll overrule the objection.  You may answer the question, Detective.

21

THE WITNESS: Thank you.

I assumed aside from what we were here to discuss today, but yes, I found nothing else that was apparent -- apparently illegal in the phone outside of this.

BY [Prosecutor]:

Q. But you gathered the evidence of the text messages.

A. Yes.

Q. And based on the judge's ruling, you can answer.  Was that, in your opinion --

A. Yes.

Q. -- evidence of illegal activity.

A. Yes.

Q. And the same question for the photos of the penises that were sent to Agent Beccaccio.

Is it -- based on your training and --

[Defense counsel]:  Your honor, same objection.

THE COURT: Same ruling.

BY [Prosecutor]:

Q. Based on your training as a law enforcement officer, did you deem those to be evidence of illegal activity?

A.  Yes.

(Doc. 80 at 25-26.)

We review the district court's evidentiary ruling for an abuse its discretion.

22

See United States v. Augustin, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam).

Caniff argues primarily that this testimony violated Fed. R. Evid. 704(b), which

"[i]n a criminal case," precludes an expert's "opinion about whether the defendant

did or did not have a mental state or condition that constitutes an element of the

crime charged or of a defense.  Those matters are for the trier of fact alone."[6]  But

Detective Greene was never offered or qualified as an expert witness.  "[J]ust

because a lay witness's position and experience could have qualified him for

expert witness status does not mean that any testimony he gives at trial is

considered 'expert testimony.'  Lay witnesses may draw on their professional

experiences to guide their opinions without necessarily being treated as expert

witnesses."  United States v. Jeri, 869 F.3d 1247, 1265 (11th Cir. 2017) (citation,

internal quotation marks, alterations omitted) (holding police officer did not testify

as expert even though his testimony "showed [his] familiarity with narcotics

investigations and his experience interviewing drug couriers"), cert. denied, 138

S. Ct. 529 (2017).

---

[6] Rule 704 provides:

**(a) In General – Not Automatically Objectionable.**  An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.**  In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

23

Moreover, even if Detective Greene did give expert testimony, Rule704(b) only precludes an expert from "expressly stat[ing] a conclusion that the defendant did or did not have the requisite intent" and from stating "an opinion as to the defendant's state of mind at the time of the offense." Jeri, 869 F.3d at 1266 (internal quotation marks omitted). But Rule 704(b) does not preclude even "expert testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead leaves this inference for the jury to draw." Augustin, 661 F.3d at 1123 (internal quotation marks, alteration omitted). Detective Greene's challenged testimony may be ambiguous, but it clearly did not expressly address Caniff's mental state. Detective Greene's testimony did not at all address whether Caniff believed Mandy was thirteen. Detective Greene, on rebuttal, testified only that he found "evidence of illegal activity" on the phone. Indeed, he did not even say what that evidence was or whether it related at all to Caniff's state of mind. "Evidence of illegality" could as easily have referred to other elements of illegality other than the mens rea element.

But even if we could say that the district court abused its discretion in permitting Detective Greene's challenged testimony, any error was harmless because there is no "reasonable likelihood that it affected [Caniff's] substantial rights." Augustin, 661 F.3d at 1123 (internal quotation marks, alterations omitted).

24

It was defense counsel, not the Government, who first asked the detective if there was "illegal activity" on the phone.  The Government, on redirect, was merely attempting to clarify any confusion the detective's responses on cross-examination may have created, and to explain why he gathered the text messages as evidence. We cannot conclude the district court abused its discretion in admitting this testimony but even if the district court did so, any error was harmless.

## III. CONCLUSION

For the foregoing reasons, we reject Caniff's challenges to his three convictions and AFFIRM.

NEWSOM, J., concurring in part and dissenting in part:

If forced to choose a favorite movie, I'd have to go with *A Man for All Seasons*, which chronicles Sir Thomas More's heroic, principled-to-the-death stand against King Henry VIII's effort to procure a divorce from Catherine of Aragon— and in the process anoint himself the head of his own newly-formed church. (Christopher Nolan's *Inception* runs a close second, for sheer mind-blowing awesomeness, but I digress . . . .)  My favorite scene from my favorite movie: a testy dialogue between More and his son-in-law-to-be, the ever-zealous Richard Roper.  Roper, anxious that the opportunistic hanger-on Richard Rich intends to double-cross More, who was then serving as the Lord Chancellor of England, pleads (along with More's wife and daughter) to have Rich arrested on the ground that he's "bad"—to which More responds, impassively, "There's no law against that."  To the objection that while they go on "talk[ing]," Rich has "gone," More rejoins, more emphatically: "And go he should even if he were the Devil himself *until he broke the law*."  Then, this gem—

> **Roper:**  So, now you'd give the Devil benefit of law!
>
> **More:**  Yes.  What would you do?  Cut a great road through the law to get after the Devil?
>
> **Roper:**  Yes, I'd cut down every law in England to do that!
>
> **More:**  Oh?  And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country is planted thick with laws from coast to coast—man's

26

laws, not God's—and if you cut them down—and you're just the man to do it—do you really think you could stand upright in the winds that would blow then?  Yes, I'd give the Devil benefit of law, for my own safety's sake.[1]

* * *

I knew this day would come—eventually, I'd have to hold my nose and cast (and then explain) a vote that I found utterly nauseating.  Well, here we are.  I couldn't agree more with the majority—and the staffer-drafters of H.R. Rep. No. 99-910, whoever they were—that "[o]f all the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purposes of child pornography."  Maj. Op. at 16.  And happily for me, Congress has given prosecutors plenty of ammunition to try, convict, and sentence the purveyors and consumers of child porn.  But, I respectfully submit, the majority's construction of 18 U.S.C. § 2251(d)(1)—to hold that when Caniff sent a private, person-to-person text message requesting explicit photos he "ma[de]" a "notice" for them—stretches that particular provision beyond the breaking point.

To be clear, I'm not suggesting that Caniff is the "Devil himself" (although the crimes of which he has been convicted are most assuredly devilish).  Nor am I any way intimating that the majority's construction of § 2251(d)(1) is tantamount

---

[1] *A Man for All Seasons* (Columbia Pictures 1966).  For this clip in particular, *see A Man for All Seasons–The Devil and The Law*, YouTube (Sept. 30, 2011), https://www.youtube.com/watch?v=d9rjGTOA2NA.

to "cut[ting] down every law in [America]"—the majority's interpretation is plausible, even if (I think) incorrect. And I am most certainly not casting myself in the role of the inimitable More. I'm simply saying that as badly as I'd like to get Caniff—to see him rung up on every count of the indictment—my job is to take the law as I find it, and however regrettable it may be to me, I cannot conclude that § 2251(d)(1) reaches Caniff's conduct here.

## I

In relevant part, 18 U.S.C. § 2251(d) prescribes stiff prison sentences—15 years to life—for any person who

> knowingly *makes*, *prints*, *or publishes*, or causes to be made, printed, or published, any *notice or advertisement* seeking or offering . . . to receive . . . any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

*Id.* § 2251(d)(1)(A) (emphasis added).

The majority doesn't contend that when Caniff sent a private text message to "Mandy" requesting photos, he "print[ed]" or "publishe[d]" anything—either a "notice" or an "advertisement." Nor does the majority contend that Caniff "ma[de]" an "advertisement" for pornographic images. Rather, the majority holds that by sending his text message Caniff "ma[de]" a "notice" for porn. Maj. Op. at

28

6–7.  That seems wrong to me for two reasons.[2]

## A

First, and most obviously, that's just not how people talk.  One would be hard-pressed to find any ordinary English speaker who would think that he "makes" a "notice" by conveying a request via text message.  If I send a text to my son asking him to pick up some milk on the way home from school, have I "ma[de]" a "notice" for milk?  And in turn, when he receives my message, would he plausibly turn to his friends and say, "I've got to run by the store—my dad has made a notice that we need milk"?  I don't think so.  Caniff's request wasn't nearly so innocuous, of course, but he no more "ma[de]" a "notice" than I did.  The majority's expansive construction seems to me to privilege how statutory terms might conceivably be used as opposed to—as I think preferable—how they are used "in their ordinary and usual sense."  *Caminetti v. United States,* 242 U.S. 470, 485–86 (1917).

---

[2] Before jumping into the merits, I should briefly clear away a bit of procedural underbrush.  As the majority notes, Caniff didn't request a jury instruction specifically defining "notice," Maj. Op. at 7–8, and he hasn't argued on appeal "that the district court made any legal error in submitting this term to the jury for its determination."  *Id.* at 16.  To be clear, I don't take issue with the jury instructions here—which, as is commonplace, just tracked the language of § 2251(d)(1).  *See United States v. Pabon-Cruz*, 391 F.3d 86, 96 (2d Cir. 2004) (declining, in a § 2251(d)(1) case, to hold that the district court plainly erred by "strict[ly] adher[ing] to the text of the statute in framing [its] jury instruction").  That said, we must still determine whether Caniff's conviction can be squared with the statute's language.  *See, e.g.*, *Smith v. United States*, 508 U.S. 223 (1993) (considering, even in the absence of a clarifying jury instruction, whether the defendant was properly convicted under 18 U.S.C. § 924(c)(1), which criminalizes the "*use of a firearm* during and in relation to . . . [a] drug trafficking crime").

**B**

Second—and this will require a bit more unpacking—there is the matter of statutory context.  The majority focuses intently on the word "notice," and it insists that there are instances in everyday parlance in which that term is used to refer to a message "given from one individual or entity to another"—such as, for example, when a utility company issues a "notice" to a customer that her power is about to be cut or an employee gives his boss "notice" that he won't be at work.  Maj. Op. at 6–11.  Thus, the majority concludes, a "notice" needn't necessarily be "sent to the general public or at least a group of people."  Maj. Op. at 9.  Fair enough—a "notice" *can* be sent from one individual to another; some uses of the word entail public dissemination, others don't.[3]  The question for us, though, isn't whether *in the abstract* the word "notice" might possibly be understood to encompass person-to-person communications.  Rather, and more specifically, the question is whether the word "notice" *as used in § 2251(d)(1)*—and as informed by the statutory context—would ordinarily be understood by the average speaker of American English to cover a private text message sent from one individual to another.  *See, e.g.*, *Tyler v. Cain*, 533 U.S. 656, 662 (2001) (emphasizing that courts should not

---

[3]  *Compare, e.g.*, *Black's Law Dictionary* 1227 (10th ed. 2014) (a "[l]egal notification required by law or agreement," such as a tenant giving a landlord "written notice" before vacating an apartment), *with*, *e.g.*, *Webster's Third New International Dictionary* 1544 (2002) ("a written or printed announcement or bulletin"—as in "inserted a notice in the newspaper").

30

"construe the meaning of statutory terms in a vacuum"); *Deal v. United States*, 508 U.S. 129, 132 (1993) (observing that the meaning of a statutory term should not be "determined in isolation," but instead "must be drawn from the context in which it is used").

Here, therefore, the fact that the term "notice" *can* be understood to describe one-to-one communications does not mean that it is *best* understood that way in § 2251(d)(1). Context is critical—here, as elsewhere, it "disambiguates." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (Thompson/West 2012). Accordingly, we must consider the term "notice" not in splendid isolation, but rather—on the principle that a "word is given more precise content by the neighboring words with which it is associated," *United States v. Williams*, 553 U.S. 285, 294 (2008)—as part of an integrated statutory provision that prescribes a stiff punishment for anyone who "makes, prints, or publishes . . . any notice or advertisement." 18 U.S.C. § 2251(d)(1)(A). As explained below, once we interpret "notice" by reference to its "neighbor[s]," it becomes clear—to me, anyway—that § 2251(d)(1) does not extend to private, person-to-person text messages.

**1**

Let's start with the verbs. Under § 2251(d)(1), it's not enough that a "notice" exist—it must have been "ma[de], print[ed], or publishe[d]." As already

31

noted, the majority doesn't suggest that, when one sends a text message he "prints" or "publishes" anything. Rather, the majority focuses on the term "make[]," which it presumably concludes needn't necessarily entail any public dissemination. Maj. Op. at 6–7. And standing alone (again, as with "notice," in the abstract), the word "make[]" *can* be understood that way—as in, to "make" an offer or request. *See Oxford Dictionary of English* 1069 (3d ed. 2010) (defining "make" to include to "communicate or express (an idea, request, or requirement)," as in "make him an offer he can't refuse"). In concluding that Caniff "made 'notices' that he desired to receive child pornography," Maj. Op. at 18, the majority essentially reads "make[]" a "notice" to mean "make[] a request."

But the context in which "make[]" is used in § 2251(d)(1) undercuts the majority's interpretation, because the word "make[]" has to be understood in the light of its statutory companions, "print[]" and "publish[]." Let's start with "publish." That the term contemplates a public communication is evident from its Latin root—"publicare." *Webster's Second New International Dictionary* 2005 (1944). True to those roots, *Webster's Second* defines "publish" to mean "[t]o make public announcement of" or "to make known to people in general"—or, alternatively, "[t]o bring before the public, as for sale or distribution." *Id.* *Webster's Third* similarly defines the term to mean "to declare publicly" or to "make generally known"—or, alternatively, "to call to the attention of the public:

32

advertise," "to place before the public (as through a mass medium)," or to "disseminate." *Webster's Third New International Dictionary* 1387 (2002). *See also Oxford English Dictionary* (3d ed. 2011), http://www.oed.com (Feb. 12, 2019) ("[t]o make public or generally known; to declare or report openly or publicly; to announce; (also) to propagate or disseminate"—or, alternatively, "to prepare and issue copies of (a book, newspaper, piece of music, etc.) for distribution or sale to the public").

"Print" is similar. The most pertinent definition in *Webster's Second* defines "print" to mean "[t]o publish a book, article, music, or the like," *Webster's Second* at 1967, and the successor in *Webster's Third* treats the term as a subset of publishing generally, defining it to include "to publish in print"—as in "all the news that's fit to print," *Webster's Third* at 1803. The *OED* likewise (as relevant here) defines "print" as meaning "[t]o cause (a manuscript, book, etc.) to be printed," "to give to the press," or "to publish." *Oxford English*.

What, then, of "make[]"? The definitions of "print" and "publish" indicate, to my mind, that the word "make[]," as used in § 2251(d)(1), is not meant in the make-a-request sense. When one says that something has been "print[ed]" or "publishe[d]," it's quite unlikely that she has in mind an audience of one. Rather, both "print[]" and "publish[]" overwhelmingly involve the announcement of a message to the public. At least as it pertains to "notice or advertisement"—

33

more on that phrase in a moment—"make[]" fits comfortably within that ambit.

The public-ness of the terms "print[]" and "publish[]" indicates that when one

"makes" a "notice or advertisement," he is likewise doing so for broad

dissemination—or at least dissemination beyond a single individual.  One could

"make[]" a "notice or advertisement" in a TV commercial or on a blog.  But at

least in the context of § 2251(d)(1), one does not "make[]" a "notice" in a private,

person-to-person text message.

**2**

But there's more—a second bit of context that informs the analysis here.

"[N]otice" is part of linguistic package—"notice or advertisement."  What can we

learn about the meaning of "notice"—again, as used in § 2251(d)(1)—from its

statutory running buddy, "advertisement"?[4]  Standard English-language

dictionaries confirm what we all know to be true—that, at least as used in modern

parlance, an "advertisement" typically entails a public statement.  *Webster's*

---

[4] With respect to the phrase "notice or advertisement," the majority objects that the *noscitur a sociis* canon—the principle that a word is known by the company it keeps—"is not particularly helpful here to define one of two statutory terms."  Maj. Op. at 14 n.4.  The canons, though, aren't hard and fast rules, so we shouldn't set an artificial floor on the number of words required for an apt comparison.  *See MBIA Ins. Corp. v. F.D.I.C.*, 708 F.3d 234, 241, 245 (D.C. Cir. 2013) (declining to accept a party's argument that "a list of two words is an inappropriate occasion for application of *noscitur a sociis*"); Scalia & Garner, *supra*, at 197 (stating that "[a]lthough most associated-words cases involve listings . . . a listing is not [a] prerequisite" because an "association is all that is required").  *Graham County Soil & Water Conservation District v. United States*, which the majority cites, does not suggest otherwise; unlike the closely related terms "notice" and "advertisement," the Court explained there that the "list of three terms [at issue were] quite distinct from the other[s] no matter how construed."  559 U.S. 280, 288 (2010).

34

*Second*, for instance, defines "advertisement" (in the only entry not marked either "obs[olete]" or "arch[aic]") to mean "[a] public notice, esp. in some public print, as a newspaper, periodical, book, poster, or handbill . . . ." *Webster's Second* at 39 (1944). *Webster's Third* echoes that definition, adding only that an advertisement is typically "paid" and may also be disseminated "over radio or television." *Webster's Third* at 31 (2002). The *OED* likewise defines "advertisement" (in its non-obsolete, non-archaic sense) to mean "a public notice or announcement, now esp. one advertising goods or services"—originally "on a placard, poster, etc., or in a journal or newspaper," and more recently "on a broadcast medium [such] as radio, television, etc." *Oxford English*. In *Black's*, more of the same: "a commercial solicitation"—"an item of published or transmitted matter made with the intention of attracting clients or customers." *Black's Law Dictionary* at 65 (10th ed. 2009).

On balance, I think that the placement of the term "notice" alongside the term "advertisement" indicates that, at least as used in § 2251(d)(1), the former, like the latter, ordinarily contemplates a public communication. The dictionaries are chock full of definitions of "notice" that closely resemble those of "advertisement." One usage of "notice," for instance, according to *Webster's Second*, is "[a] written or printed sign . . . communicating information or warning"—as in "to put a notice on a door." *Webster's Second* at 1669. So too in

35

*Webster's Third*: "a written or printed announcement or bulletin—like "insert[ing] a notice in the newspaper." *Webster's Third* at 1544. And the *OED*: "a displayed sign or placard giving news or information" (such as, for example, "notices on the bulletin board at your grocery store, describing your product and giving a price") or "[a] short announcement or advertisement in a newspaper, magazine, etc." *Oxford English*. And *Black's*, as well: "[a] written or printed announcement"—as in "the notice of sale was posted on the courthouse bulletin boards." *Black's Law Dictionary* at 1227. *Cf. also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575–76 (1995) (interpreting the phrase "any communication" to refer only to public communications, in part because the adjacent inclusion of the terms "*notice, circular, [and] advertisement*" made it "apparent that the list refer[red] to documents of *wide dissemination*" (emphasis added)).[5]

A common theme unites these definitions of the statutorily connected terms "notice" and "advertisement": a communication that is usually commercial in nature and usually conveyed via public medium—sign, poster, placard, bulletin

---

[5] I'm mindful, of course, "that identical language may convey varying content when used in different statutes." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015). But for what it's worth, other statutes—like the one at issue in *Gustafson*—use language like that found in § 2251(d)(1) in contexts that one would (I think) tend to associate with wide dissemination. Title VII, for instance, makes it unlawful—in the context of job postings—"to print or publish . . . *any notice or advertisement* relating to employment" that includes discriminatory preferences. 42 U.S.C. § 2000e-3 (emphasis added). The Fair Housing Act does the same for those who publicize the availability of housing, making it unlawful to "make, print, or publish, or cause to be made, printed, or published *any notice, statement, or advertisement*" indicative of such preferences "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c) (emphasis added).

board, newspaper, radio, television, etc.  Where do text messages fit?  I don't think

they do.  To the chagrin of many—and perhaps especially many parents of

teenagers [said the parent of teenagers]—text messages have largely replaced face-

to-face communications and telephone conversations.  They are not, though, the

modern-day analogues of the public-facing media so pervasively referenced in the

definitions of "notice" and "advertisement."  (It is worth noting in this

connection—even if only briefly—that under the majority's broad interpretation, a

person also "make[s]" a "notice" within the meaning of § 2251(d)(1) when she

places a telephone call.  That seems strange to me, but it follows inexorably from

the majority's logic.)

    To be clear, saying that, as used in § 2251(d)(1), a "notice" entails some

public dissemination does not require that it be blasted to the public at large.

Other circuits have held, for instance—I think correctly—that § 2251(d)(1) makes

it a crime to post offers to buy and sell child pornography in computer "chat

rooms."  *See, e.g.*, *United States v. Grovo*, 826 F.3d 1207, 1211 (9th Cir. 2016)

(message visible to 40–45 people); *United States v. Franklin*, 785 F.3d 1365, 1367

(10th Cir. 2015) (message visible to 108 people).  Posts in chat rooms or to online

message boards are just the contemporary (and nefarious) successors to the signs,

posters, and placards to which pre-internet dictionaries refer.  That an online

message board might be password-protected doesn't make the "notice[s] or

37

advertisement[s]" posted there any less public—it's the equivalent of a bulletin board in a college dorm that requires keycard access to enter.

In any event, I conclude that, on balance, the juxtaposition of the words "notice" and "advertisement"—particularly following, as they do, the verbs "make[]," "print[]," and "publish[]"—favors an understanding of "notice" that entails dissemination to more than a single individual.[6]

\* \* \*

The unfortunate bottom line for me is this: No ordinary speaker of American English would describe a private, person-to-person text message—whether

---

[6] There are two loose ends concerning the phrase "notice or advertisement." First, the majority takes great pains to emphasize that the phrase is preceded by the word "any." Maj. Op. at 11–12. It's true, of course, that "any" is a capacious term—we've said so repeatedly. But it's equally true that the net cast by the term "any" is necessarily limited by a proper understanding of the nouns that it modifies. Introduction of that one word provides no basis for grafting onto the phrase "notice or advertisement" a construction that neither ordinary meaning nor statutory context sensibly supports. Moreover, if the word "any" bore the weight that the majority assigns to it—such that it ropes in every communication, public and private alike—one is left to wonder why Congress would have drafted so elliptically. Why not just use the more economical "any communication"?

Second, and separately, given the usual rule that we are "obliged to give effect, if possible, to every word Congress used," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979), what distinguishes a "notice" from an "advertisement?" Well, plenty of things: an advertisement typically embodies a commercial message in a way that a notice need not; an advertisement is usually designed to induce its recipient to respond in a way that a notice isn't necessarily. In any event, even if, as to public-ness, there isn't much daylight between the two terms as I understand them, I wouldn't give § 2251(d)(1) a meaning that the text doesn't comfortably support based on a desire, however well-intentioned, to avoid surplusage. "Doublets and triplets abound in legalese," especially given that Congress more than occasionally brings a "belt-and-suspenders" mentality to drafting statutes. *See* Scalia & Garner, *supra*, at 176–77 (cautioning that the surplusage canon must be applied "with careful regard to context" and that "a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage").

requesting milk from the grocery or, far more disgustingly, pornographic images from a teenager—as the "mak[ing]" of a "notice." And the context in which those terms are used in § 2251(d)(1)—surrounded as they are by words like "print[]," "publish[]," and "advertisement"—confirms that the proscription on "mak[ing]" a "notice" doesn't reach Caniff's conduct.[7]

## II

At bottom, the majority's interpretation of § 2251(d)(1) isn't textual—it's purposive. *See, e.g.*, Maj. Op. at 16 (relying on out-of-circuit district court opinions asserting Congress's "clear statutory purpose" and "primary intent") (quoting *United States v. Peterson*, No. CR 12-228-GW, 2015 WL 13657215, at *5 (C.D. Cal. Mar. 20, 2015) (unreported), and *United States v. Christie*, 570 F. Supp. 2d 657, 665 (D. N.J. 2008)). To be clear, I'm fully on board with the objective of "eradicat[ing] the child-pornography market," *id*.—and again, Congress seems to

---

[7] Although by no means necessary to my conclusion, I'm tempted to pile on by invoking the rule of lenity—which states, in essence, that if at the end of the interpretive road, having applied the applicable semantic and contextual canons of interpretation, there exists any meaningful doubt about the application of a criminal statute to a defendant's conduct, then the doubt should be resolved in the defendant's favor. *See* Scalia & Garner, *supra*, at 296–302. Caniff, though, hasn't invoked the rule in support of his contention that § 2251(d)(1) doesn't reach his conduct, and this Court seems to have held—oddly to my mind—that a criminal defendant can waive a lenity-based argument by failing to affirmatively assert it. *See United States v. Thompson*, 702 F.3d 604, 608 n.1 (11th Cir. 2012). I tend to think of the rule of lenity, like any other interpretive canon, not as a litigating position of the sort that might be waived or abandoned, but rather as an in-the-nature-of-things clue to the meaning of a statutory enactment—a clue that a court could, and even should, invoke on its own if necessary to a proper interpretation. But that's an issue for another day.

39

have done a good job of enacting a cluster of statutes that substantially advance that objective. But even in the service of such a noble purpose, we can't make one of the statutes within that cluster—§ 2251(d)(1)—say what it doesn't say. Section 2251(d)(1)'s ordinary meaning should inform what we take to be Congress's purpose, not the other way around. *See United States v. Wiltberger*, 18 U.S. 76, 96 (1820) (Marshall, C.J.) (stating that "[t]he intention of the legislature is to be collected from the words they employ" and elaborating that "[t]o determine that a case is within the intention of a statute, its language must authorise us to say so").

The majority is chiefly concerned that interpreting § 2251(d)(1) in accordance with (what I think to be) its ordinary meaning would create a "loophole" in the child-pornography laws that "would leave the most vulnerable of the victims of pedophilia unprotected against the most effective and hardest to detect predatory conduct." Maj. Op. at 17. Fortunately, that's not true. Regardless of what we say today about § 2251(d)(1)'s reach, Title 18 includes an entire chapter dedicated to punishing the "Sexual Exploitation and Other Abuses of Children." The provisions included in that chapter pretty well cover the waterfront, and they give the government ample ammunition to get at the peddlers and consumers of child porn—including those, like Caniff, who solicit their smut through private text messages.

Perhaps most clearly, 18 U.S.C. § 2251(a) prescribes a 15-years-to-life

40

sentence for anyone "who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." That prohibition extends not only to those who solicit minors for sex, but also to those, like Caniff, who ask for nude photos—the surest proof being that Caniff was charged and convicted under § 2251(a), and we have affirmed that conviction today. *See also, e.g.*, *United States v. Mathis*, 767 F.3d 1264, 1279 (11th Cir. 2014) (rejecting a sufficiency-of-the-evidence challenge to a § 2251(a) conviction of a defendant who sent a text message to a minor "offer[ing] to pay [the minor] for a picture of [her] genitalia" and "direct[ing the minor] to take sexually explicit pictures").

Then there's 18 U.S.C. § 2252(a)(2), which makes it a crime—punishable by five to 40 years in prison—to "knowingly receive[] . . . any visual depiction" of a minor engaging in "sexually explicit conduct" by "using any means or facility of interstate or foreign . . . mails." So too § 2252A, which makes it a crime—also punishable by five to 40 years—to knowingly receive "any child pornography that has been mailed . . . using any means or facility of interstate or foreign commerce . . . by any means, including by computer." Notably, wholly apart from the act of *soliciting* nude photos, § 2252(a)(2) and § 2252A allow the government to separately charge an individual if he *receives* pictures via "any means or facility of interstate or foreign commerce." Thus, it seems to me, there is essentially zero risk

41

that an ordinary-meaning interpretation of § 2251(d)(1) would (as the government warns) allow individuals like Caniff to "circumvent federal law merely because child pornography is noticed or advertised to an individual via text message."  Br. of Appellee at 39.

In short, Caniff's conduct is covered; Congress's intent has been well served.  We needn't, and shouldn't—either in the name of statutory "purpose" or otherwise—graft onto § 2251(d)(1) a strained, acontextual interpretation.

### III

There's a big piece of me that thinks that because Caniff (even more so than Master Rich) is "bad," he should have the book—for that matter, the whole library—thrown at him.  The law, though, is a pesky thing.  Caniff, while guilty of many crimes—some charged, some not—is not guilty of "mak[ing], print[ing], or publish[ing]" an "advertisement or notice" for child pornography within the meaning of 18 U.S.C. § 2251(d)(1).  Accordingly, while I join Parts I, II.B., and II.C of the majority opinion, I must respectfully dissent from Part II.A.